NOTICE

Decision filed 07/17/15. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2015 IL App (5th) 130013

NO. 5-13-0013

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 11-CF-636 |
| | ) | |
| JOSHUA MUELLER, | ) | Honorable |
| | ) | William G. Schwartz, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court, with opinion.
Justices Goldenhersh and Stewart concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Joshua Mueller, appeals his conviction for retail theft and the extended-term four-year sentence in the Illinois Department of Corrections that followed the conviction. For the following reasons, we reverse and remand for a new trial.

¶ 2                                    FACTS

¶ 3    The facts necessary to our disposition of this appeal are taken from the transcript of the defendant's jury trial, which took place on October 31, 2012, and are as follows. During *voir dire*, the trial court judge questioned the potential jurors individually. With regard to the four principles of law set forth in Illinois Supreme Court Rule 431(b) (eff.

1

July 1, 2012), commonly known among practicing criminal law attorneys as the "*Zehr* principles,"[1] his questions varied from potential juror to potential juror. The judge asked many of the potential jurors if they understood that the defendant was presumed innocent, but not if they accepted this principle. The judge asked all of the potential jurors if they would "require" the State to prove the defendant guilty beyond a reasonable doubt, but he did not ask all of them if they understood what the principle means. He also asked all of the potential jurors if they understood that the defendant did not have to present any evidence or testify, and that if the defendant did not testify they could not hold it against him, but none of the potential jurors were asked if they accepted these last two principles. Counsel for the defendant did not object to the content of the trial judge's *voir dire* questioning.

¶ 4    In her opening statement, counsel for the State described the offense the defendant was alleged to have committed, which was the theft of two men's winter coats, and told the jury that it would "be able to see the video surveillance that took place that day," and that it would "be able to watch the defendant pick up merchandise from the store and exit the doors without paying for the coats." The State also told the jury that it would hear

---

[1]See *People v. Zehr*, 103 Ill. 2d 472, 477 (1984). The principles are that a defendant: (1) is presumed innocent of the charge(s) against him or her; (2) is not required to offer any evidence on his or her own behalf; (3) must be proved guilty beyond a reasonable doubt; and (4) may not have his or her failure to testify held against him or her.

2

Officer Tim Lomax of the Carbondale police department testify "that he too watched that video surveillance and recognized that individual taking the coats as the defendant."

¶ 5    The first witness to testify for the State was Dana Womick. She testified that at the time of the trial, she worked part-time at the Macy's store in the University Mall in Carbondale as a sales associate, but that approximately 11 months earlier, on November 26, 2011, she had been working at the store as a loss prevention officer. Her duties on that date were to "watch for shoplifters or watch our employees for thefts." She testified with regard to the closed-circuit surveillance system at the Macy's store, stating that she had both training and experience in its use.

¶ 6    Womick also testified about the manner in which she and her fellow loss prevention officers conducted investigations. She stated that they would "watch our customers for anyone who gives signs," and that sometimes they would monitor the closed-circuit system from the "camera room" and other times would do "walk-abouts" on the sales floor and follow customers of whom they were suspicious. The officers would typically communicate by cell phone, but a store phone was also available for communications.

¶ 7    Womick testified that on November 26, 2011, at approximately 5 p.m., she observed a male and a female in the "very back end of the home store." She considered the couple suspicious because they had what Womick characterized as "several totes *** just random totes, empty-looking totes." Womick was watching the couple through the closed-circuit system and called a fellow loss prevention officer, who was on the sales floor, to come observe them through the system in the camera room with her. The

3

suspicious couple separated, with the female going to a fitting room with some clothing and some of the totes and the male staying in the women's clothing area "walking up and down the aisle."

¶ 8    Counsel for the State then asked Womick if she was "physically observing the male at this point," and Womick reiterated that she was still watching the male through the closed-circuit camera system.  Counsel next asked, "Do you see the male that you were observing at this time in the courtroom today?"  Womick answered that she did and identified the defendant as the male she had observed.  She then testified that the female subsequently left the store without the items of clothing she had been carrying.  Womick testified that the male remained in the store and that "it appeared he was looking for his wife."  The male then left the store "using the entrance to the mall" and reentered "[s]everal–probably three times."  Womick testified that she believed the male "was in our store three times."  She also testified that she and her coworker believed the male would reenter the store because they "felt like he was looking for his–whoever he was with."  By the time he reentered for the first time, Womick had moved from the camera room to the sales floor, while her coworker remained in the camera room.  The male left again.  When he reentered for what Womick characterized as the "third time,"[2] she was not aware that he was back in the store until her coworker called her.

_____

[2]We acknowledge the inconsistency between Womick's testimony that she believed the male "was in our store three times" and her testimony that he "re-entered" the store three times, the latter of which would of course mean that he was in the store a

4

¶ 9    Womick was then asked if she subsequently learned the male "was about to leave the store," and she testified that she "was walking into the men's department and [her] co-worker was on the telephone with [her] saying that he was in the men's department." She testified that she was "coming to find" the male, that it was now approximately "5:45, 5:50" p.m., and that she watched the male exit the store, "carrying two jackets," through "the west entrance exit into the parking lot." She stated that she "was very close behind him as he went out the door." She followed him, but when he noticed her, he began to run. Womick testified that she yelled for the male to stop, but that she, and a loss prevention officer from JC Penney with whom she had been in contact and who was now outside as well, could not catch the male before he disappeared from view. Along the way, the male discarded the coats he was carrying, "along with one of the fairly empty tote bags of his own." Womick was shown a photograph of two winter coats and identified them as the coats she had observed the male "drop outside of the store." No photographs were shown of, and no additional testimony was adduced with regard to, the tote bag that allegedly belonged to the defendant and was allegedly left behind as well, and the loss prevention officer from JC Penney was not called as a witness at the trial.

¶ 10    Counsel for the State then asked Womick more details about the closed-circuit surveillance system. Womick testified that the cameras were "very good" and could be zoomed in so closely that she could "read what is being rang [*sic*] up on the cash register" and could "see the color of a person's eyes." She testified that she was trained "to get a

total of four times.

good facial shot" of suspicious persons, and that on the date in question, she was able to zoom "right into [the male's] face." She testified that the cameras recorded directly to a hard drive, and that if she wanted to retrieve footage that had been recorded, she could find the footage she wanted and record it "onto a disk." She testified that with regard to the date in question, she "copied the section where [the male] entered the men's department and picked up the two coats and exited the door." She testified that she did not make any additions to the footage or change it in any way. She testified that the disk she made fairly and accurately depicted the video footage she viewed before making the disk–in fact, she testified that it was "exactly the same" as the footage she viewed before making the disk–and she then authenticated a video disk presented to her by the State as the disk she made.

¶ 11    The video disk presented by the State was admitted into evidence without objection and was played for the jury. It is part of the record on appeal and has been viewed by this court. The video disk contains approximately 38 seconds of footage, all of which is somewhat grainy. The first 11 seconds of footage show, from a distance, an individual who appears to be a man looking around at items of clothing in the men's department. At approximately the 11-second mark, two other shoppers pass closely by the individual, who steps away from a merchandise table. After they have passed, the individual then picks up at least one item of clothing from the table and exits the store through a nearby door, disappearing from the footage at approximately the 27-second mark. Approximately three seconds later, a female enters the footage from the far right and makes her way across the screen, at a brisk walk, to the door used by the individual.

6

The female disappears from the footage at approximately the 35-second mark. Nothing of significance is seen in the final three seconds of footage. After the video disk was played for the jury, Womick testified that she was the female seen near the end of the footage. She was not asked–and she did not testify as to–why, if she was trained "to get a good facial shot" of suspicious persons and if on the date in question she was able to zoom "right into [the male's] face," no such footage of the male, either before or during the alleged theft, was presented to the jury.

¶ 12 On cross-examination, however, Womick was asked if the footage that was shown to the jury was "on zoom." She testified that it was "somewhat zoomed in" and "[p]artially zoomed in." She testified that she was "probably 20 feet" from the male when he exited the store, although she acknowledged that her answer "would be a guess." She testified that although she spoke that night with a Carbondale police officer, she had no further contact with the police and was not informed when an individual was subsequently arrested in the case. She was never asked to identify a suspect in a police line-up, or from a photograph, and although she testified that she saw the defendant "in Macy's" on November 26, 2011, she stated that she had never seen him before that date or since that date, until the date of trial.

¶ 13 On redirect examination, Womick testified that at one point in her investigation she was within "six feet, maybe six to ten feet" of the male suspect, and that although the male "had left the store on occasions," she believed that "between the cameras and being on the floor following him," she had spent "probably at least a half an hour" observing the male.

¶ 14    The next witness to testify for the State was Officer Tim Lomax of the Carbondale police department. He testified that on November 26, 2011, he responded, while on duty, to a call at Macy's regarding a retail theft, and that once he arrived at the store he spoke with Jessica Freeman[3] in the loss prevention office. He testified that he was familiar with the zoom function of the store's cameras, and when asked if he had watched any footage that night "when it had been zoomed," he testified, "I believe so, yes." He was then asked if he recognized the video disk that previously had been shown to the jury. Officer Lomax testified that he did, that he had viewed what was contained on the disk, and that what was contained on the disk fairly and accurately depicted what he had "watched on the video surveillance that day."

¶ 15    Counsel for the State then asked if, when he "watched the video," he saw an individual he could identify. He answered, "I did." Counsel for the State immediately thereafter asked, "And when you watched the footage on this video, did you identify the same individual?" Officer Lomax testified, "I don't recall about the disk, no." He was then asked whom he identified when he "viewed the video footage." Counsel for the defendant immediately objected, stating, "The video footage that we are dealing with is the one being admitted into evidence [on the disk]. Any other video footage he is testifying to would be hearsay." The objection was sustained and counsel for the State

---

[3]We note that Womick identified her coworker as "Jasmine Freeman." We do not know the actual first name of the coworker and do not consider it relevant to our disposition of this appeal.

did not again ask Officer Lomax about the identity of the individual allegedly involved in the theft, nor did she ask any other questions about how the defendant was identified as a suspect in this case, or when or how the defendant was subsequently arrested.

¶ 16 Counsel for the defendant declined to cross-examine Officer Lomax. The State then rested, and counsel for the defendant moved for a directed verdict, which was denied. The defendant exercised his right not to introduce any evidence on his own behalf, and, in conjunction with the exercise of that right, stated for the record, outside the presence of the jury, that it was his "desire not to testify." Following a final conference on jury instructions, the parties offered their closing statements. Counsel for the State argued that "[t]he evidence you heard and saw today shows that the defendant *** committed the offense of retail theft," and that "[w]e see from the video the defendant taking possession of the merchandise."

¶ 17 In her closing statement, counsel for the defendant argued that Womick was not a credible witness, pointing out that although Womick still works for Macy's, she is no longer in loss prevention. Counsel suggested that the reason Womick is no longer in loss prevention is that although Womick testified that she was "very close behind" the male when he exited Macy's, the video showed that Womick was "so far behind that the door gets to close before she even gets there," and that "[a]ny loss prevention person would be there before that door closes." She questioned the reliability of Womick's identification of the defendant as the male in Macy's that day, noting that the defendant has no distinguishing features such as tattoos and that no other distinguishing features were identified by Womick or any other witness. Counsel implied that Womick's continued

9

employment with Macy's, albeit in a different capacity, provided her with an interest in the outcome of the case and with a motive to testify falsely, stating in support thereof, "It would be embarrassing for her to sit up there and say, 'I still work for Macy's, I am not sure that's the guy or not.' " Counsel pointed out that the State could have presented other witnesses in addition to Womick, but did not. With regard to Womick and the video, counsel argued, "There is no way she positively identified my client being that person on the video. You have seen the video. Is that even a man? There's a strap. Is the person carrying a purse?"

¶ 18    In rebuttal, counsel for the State argued that Womick had also testified that she had followed the male "around the store" and had zoomed in on his face while watching him in the camera room. As she concluded her rebuttal, counsel stated, "I submit to you to watch the video. We watched the video and you can–you are free to use your common sense. Does that look like the defendant? The witness is–the video is a silent witness. It has no prejudices, no interests, no biases. It is what it is. From the video you saw the defendant pick up the coats and exit the store."

¶ 19    The jury was instructed on the applicable law and at 3:15 p.m. retired to deliberate. At some point thereafter–the exact time of which is not included in the record–the jury sent to the trial judge a note that stated: "Can we please see the video? We feel that it was too far away." The judge stated that his intention was "to replay the video for the jurors with the screen pulled closer to the jury box." Neither party objected, and counsel for the defendant noted for the record, "[M]y approximation is the TV is now ten feet closer to the jury," to which the trial judge responded, "Oh, at least."

10

¶ 20    As the judge prepared to again play the video disk for the jury, juror H. asked if there was "any way you can extend that to the full screen so it is expanded a little more?" The judge's one-word answer was "nope." He played the video disk for the jury, and then, without prompting from the jury or from either party, asked, "Is that good or do you want me to play it one more time?" Juror B. stated the following: "Could you play that one more time? Could you pause one part particularly? Freeze frame?" Juror A. then asked, "Could you freeze it? Can you freeze it?" Despite having just asked the jurors, *sua sponte*, if they wished for him to play the video disk one more time, and despite juror B. asking, *inter alia*, if the judge could play it one more time, the judge's response– apparently to all of the questions just asked of him–was again the single word "nope," to which juror A. responded, "Aw, man." The jury returned to the jury room to deliberate and at 4:20 p.m. returned with a verdict finding the defendant guilty of retail theft. The defendant was subsequently sentenced to an extended-term four-year sentence in the Illinois Department of Corrections, and this timely appeal followed.

¶ 21                                ANALYSIS

¶ 22    On appeal, the defendant contends that: (1) the trial judge committed reversible error because he did not comply with the *voir dire* requirements of Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and (2) the trial judge committed reversible error because he failed to exercise his discretion when he "flatly rejected the requests from multiple jurors to freeze or enlarge the brief, grainy video footage." The defendant concedes that he did not raise these issues at trial, or in a posttrial motion, but argues that

11

the evidence in this case was closely balanced, and that therefore the alleged errors are subject to plain-error review.

¶ 23　We begin by addressing the defendant's first contention.　When a defendant requests plain-error review of an alleged error, the reviewing court's first step "is determining whether any error occurred." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).　In this case, the State concedes that error occurred, because the trial judge failed to comply with the *voir dire* requirements of Rule 431(b) when he failed to ask the potential jurors if they understood and accepted the four *Zehr* principles.　We accept the State's concession.　At the time of the defendant's trial, Rule 431(b) provided that the trial judge "shall ask each potential juror, individually or in a group, whether that juror understands and accepts" the four *Zehr* principles.　Ill. S. Ct. R. 431(b) (eff. July 1, 2012).　As explained above, during *voir dire* the trial judge asked many of the potential jurors if they understood that the defendant was presumed innocent, but not if they accepted this principle.　The judge asked all of the potential jurors if they would "require" the State to prove the defendant guilty beyond a reasonable doubt, which as the State points out could be construed to mean that he asked them if they accepted this principle, but he did not ask all of them if they understood what this principle means.　He also asked all of the potential jurors if they understood that the defendant did not have to present any evidence or testify, and that if the defendant did not testify they could not hold it against him, but none of the potential jurors were asked if they accepted these last two principles.　As the Supreme Court of Illinois recently reiterated, "the language of Rule 431(b) is clear and unambiguous; the rule states that the trial court 'shall ask' whether jurors understand and

12

accept the four principles set forth in the rule. The failure to do so constitutes error." *People v. Belknap*, 2014 IL 117094, ¶ 45.

¶ 24 Having established that the trial judge erred when he failed to comply with the *voir dire* requirements of Rule 431(b), we must next determine whether, pursuant to the application of the plain-error doctrine, the errors necessitate reversal and remand for a new trial. As noted above, the defendant concedes that he did not raise the issue of the trial judge's Rule 431(b) errors at trial or in a posttrial motion, and that therefore this issue is procedurally forfeited. See, *e.g.*, *People v. Naylor*, 229 Ill. 2d 584, 592 (2008) (to properly preserve alleged trial error, defendant must: (1) object at trial, and (2) include claim of error in written posttrial motion). The defendant nevertheless contends the errors are subject to plain-error review. "The plain-error doctrine allows errors not previously challenged to be considered on appeal if either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error was so fundamental and of such magnitude that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Wilmington*, 2013 IL 112938, ¶ 31. In this case, the defendant does not allege that the errors are reviewable under the second prong listed above; rather, he contends only that the errors are reviewable under the first prong, *i.e.*, because the evidence in this case was closely balanced.

¶ 25 When reviewing a claim of error under the first prong of the plain-error doctrine, "a reviewing court must undertake a commonsense analysis of all the evidence in context" to determine if the evidence is closely balanced. *People v. Belknap*, 2014 IL

117094, ¶ 50. That assessment must be "a qualitative, as opposed to a strictly quantitative," one (*id.* ¶ 53) and must take into account "the totality of the circumstances." *Id.* ¶ 62. Moreover, as quoted above, the evidence must not only be closely balanced, but must be "so closely balanced that the error alone threatened to tip the scales of justice against the defendant." *People v. Wilmington*, 2013 IL 112938, ¶ 31. Under either prong of the plain-error doctrine, it is the defendant who bears the burden of persuasion. *Id.* ¶ 43.

¶ 26 The State's evidence in this case is described in detail above. On appeal, the State contends this evidence was not closely balanced, and therefore plain-error review of the claims of error put forward by the defendant is not available. Specifically, the State posits that the evidence adduced against the defendant at trial was "overwhelming," noting that Womick testified that she was trained to watch for shoplifters, that she observed the defendant both by camera and in person for about half an hour, that she was able to zoom her camera clearly to see the defendant's face, and that she got within "a few feet" of the defendant while observing him in person. The State also contends that Womick "unequivocally stated that the person she saw take the garments and leave the store was [the] defendant," and, perhaps in an attempt to minimize the problematic video footage, the State makes the rather dubious claim that "neither the State nor the defense counsel focused on the video clip in closing argument." The State also claims that "Officer Lomax viewed the in-store camera feed, testified he knew the perpetrator, and [the] defendant was then arrested for the crime."

14

¶ 27 There are a number of problems with the State's arguments, and we are far from convinced that the evidence against the defendant was "overwhelming." To the contrary, our commonsense, qualitative analysis of the State's evidence, viewed within the totality of the circumstances, leads us to conclude that the defendant has met his burden of persuading us that the evidence in this case was so closely balanced that the trial judge's Rule 431(b) errors alone threatened to tip the scales of justice against the defendant.

¶ 28 It is true that Womick testified that she was trained to watch for shoplifters and in the use of the store's closed-circuit surveillance system. In fact, with regard to the latter, she testified that the surveillance cameras were "very good" and could be zoomed in so closely that she could "read what is being rang [*sic*] up on the cash register" and could "see the color of a person's eyes." She also testified that she was trained "to get a good facial shot" of suspicious persons, and that on the date in question, she was able to zoom "right into [the male's] face." Nevertheless, the jury was presented with video footage that Womick herself characterized as "somewhat zoomed in" and "[p]artially zoomed in," and that, to put it mildly, would not allow a viewer to see the color of anyone's eyes.

¶ 29 Perhaps a technical explanation exists for the disparity between the zooming capabilities Womick claimed the cameras possessed and the footage actually captured from those cameras and presented to the jury. However, although Womick testified in detail about the process of making a video disk from footage captured by the cameras, she never addressed any such technical explanation for the disparity in quality, and, as we noted above, she was not asked–and she did not testify as to–why, if she was trained "to get a good facial shot" of suspicious persons and if on the date in question she was able to

15

zoom "right into [the male's] face," no such footage of the male, either before or during[4] the alleged theft, was presented to the jury. On this basis alone, the jury could have begun to doubt the accuracy of Womick's testimony and her credibility as a witness.

¶ 30    The problems with Womick's testimony do not end here, however. Although Womick testified that she was "probably 20 feet" from the male when he exited the store, she also characterized herself as "very close behind him as he went out the door." The images presented on the video disk do not support either piece of testimony, which also could have led the jury to doubt Womick's credibility. Indeed, perhaps the only thing that is clear from the video disk is that, as explained above, approximately three seconds after the male disappears from the footage through the exit door, a female–later identified by Womick as herself–enters the footage from the far right and, over the next approximately five seconds, makes her way across the screen, at a brisk walk, to and out the exit door. Accordingly, although Womick testified that she was within "six feet, maybe six to ten feet" of the suspicious male at one point in her investigation, the jury at this point had

---

[4]Obviously, Womick was on the sales floor at the time the suspicious male exited the store with the merchandise and could not control the amount of zooming done by her coworker at that time. However, she specifically testified that she was able to zoom "right into [the male's] face" while observing him before any alleged wrongdoing occurred, and presumably absent some kind of technical limitation in the recording capacity of the equipment, that zoomed footage of the male could have been presented to the jury as well.

16

reason to doubt Womick's ability to accurately gauge and testify to distances, and no other context was presented regarding her "maybe six to ten feet" statement. Indeed, with regard to following the male, the defendant is correct when he notes that Womick never testified that while on the sales floor–as opposed to while viewing the floor via the surveillance system–she had a clear, unobstructed view of the male, and never testified with specificity as to where in the store the two were located when she was allegedly so close to the male. Moreover, although she testified that "between the cameras and being on the floor following him," she had spent "probably at least a half an hour" observing the male between the occasions when he left the store, she never testified explicitly as to how much time was spent in each capacity, and her testimony that she was "coming to find" the male in the men's department just before he exited the store for the final time does not comport with the idea that she was observing him closely and/or from a fixed position on the floor for very long at all.

¶ 31 In addition, although not determinative of the result we reach today with regard to the closeness of the evidence, we must add that we cannot agree with the State's assertion that Womick "unequivocally stated that the person she saw take the garments and leave the store was [the] defendant." Had she been asked different or additional questions, perhaps Womick would have made such an unequivocal identification of the defendant as the person who took the coats and left the store, although this of course would not negate the other problems with Womick's testimony, discussed above. However, as explained above, the only actual identification of the defendant by Womick at trial occurred on direct examination, and related not to anyone leaving the store with merchandise, but to

Womick observing what she deemed to be a suspicious male "walking up and down the aisle" while waiting for his female companion to return from a fitting room. Counsel for the State specifically asked Womick if she was "physically observing the male at this point," and Womick reiterated that she was still watching the male through the closed-circuit camera system. Counsel next asked, "Do you see the male that you were observing at this time in the courtroom today?" Womick answered that she did and identified the defendant as the male she had observed. At no point did Womick identify the defendant as the male she had followed in person, nor did she ever state that the male she observed via video was the same male she observed in person, although counsel for the State repeatedly referred to the male she had followed in person as the defendant, and Womick did answer "yes, he was carrying two jackets" when counsel for the State asked, "When you observed the defendant exiting the store, was he carrying anything?" In light of the foregoing, we cannot agree with the State's contention that Womick "unequivocally stated that the person she saw take the garments and leave the store was [the] defendant." She was never asked to make such a statement, and she did not.

¶ 32   The defendant is also correct in asserting that he was not arrested at the scene, and that when he was subsequently arrested, he was not in possession of any proceeds of the theft. Womick conceded that she had never seen the defendant prior to the date she allegedly saw him in Macy's, November 26, 2011, and stated that until the date of the trial, nearly one year later, she had not seen him since. She testified that she was never asked by police to identify a suspect in a police line-up or from a photograph. As we noted above, no photographs were shown of, and no additional testimony was adduced

18

with regard to, the tote bag that allegedly belonged to the defendant and was allegedly left behind as well, and neither the loss prevention officer from JC Penney nor Womick's loss prevention coworker was called as a witness at the trial.

¶ 33   We must also take issue with the State's claim that "Officer Lomax viewed the in-store camera feed, testified he knew the perpetrator, and [the] defendant was then arrested for the crime," for it is not an accurate characterization of what happened at trial.  In her opening statement, counsel for the State told the jury that it would hear Officer Lomax testify "that he too watched that video surveillance and recognized that individual taking the coats as the defendant."  In fact, as described above, Officer Lomax was asked if, when he "watched the video," he saw an individual he could identify.  He answered, "I did."  Counsel for the State immediately thereafter asked, "And when you watched the footage on this video, did you identify the same individual?"  Officer Lomax then testified, "I don't recall about the disk, no."  He was then asked whom he identified when he "viewed the video footage."  Counsel for the defendant immediately objected, stating, "The video footage that we are dealing with is the one being admitted into evidence [on the disk].  Any other video footage he is testifying to would be hearsay."  The objection was sustained and counsel for the State did not again ask Officer Lomax about the identity of the individual allegedly involved in the theft, nor did she ask any other questions about how the defendant was identified as a suspect in this case, or when or how the defendant was subsequently arrested.  In light of Officer Lomax's testimony on direct examination, counsel for the defendant astutely declined to cross-examine him. We do not believe the testimony of Officer Lomax does anything to make the evidence

19

less closely balanced in this case, particularly when one considers that the jury was told by the State in its opening statement that the officer would identify the defendant, but in fact he made no such identification.

¶ 34  Overall, the quality of Womick's testimony was weak.  It is therefore not surprising that in closing argument, counsel for the defendant attacked Womick's credibility, pointing out that although Womick still works for Macy's, she is no longer in loss prevention.  Counsel suggested that the reason Womick is no longer in loss prevention is that she was not very good at it and in support of this suggestion pointed out that although Womick testified that she was "very close behind" the male when he exited Macy's, the video showed that Womick was "so far behind that the door gets to close before she even gets there," and that "[a]ny loss prevention person would be there before that door closes."  She questioned the reliability of Womick's identification of the defendant as the male in Macy's that day, noting that the defendant has no distinguishing features such as tattoos and that no other distinguishing features were identified by Womick or any other witness.  Counsel implied that Womick's continued employment with Macy's, albeit in a different capacity, provided her with an interest in the outcome of the case and with a motive to testify falsely, stating in support thereof, "It would be embarrassing for her to sit up there and say, 'I still work for Macy's, I am not sure that's the guy or not.'"  Counsel pointed out that the State could have presented other witnesses in addition to Womick, but did not.  With regard to Womick and the video, counsel argued, "There is no way she positively identified my client being that person on the

20

video. You have seen the video. Is that even a man? There's a strap. Is the person carrying a purse?"

¶ 35 In rebuttal, counsel for the State argued that Womick had also testified that she had followed the male "around the store" and had zoomed in on his face while watching him in the camera room. As she concluded her rebuttal, perhaps realizing that Womick's testimony was not as persuasive as she might have hoped, counsel stated, "I submit to you to watch the video. We watched the video and you can–you are free to use your common sense. Does that look like the defendant? The witness is–the video is a silent witness. It has no prejudices, no interests, no biases. It is what it is. From the video you saw the defendant pick up the coats and exit the store."

¶ 36 Apparently it was the desire of the jury to take the State up on its suggestion to look to the video for a disinterested and unbiased depiction of the defendant's alleged crime. This is not surprising, because although the State attempts on appeal to minimize the importance of the video disk, we note that even in her opening statement, counsel for the State described the offense the defendant was alleged to have committed and told the jury that it would "be able to see the video surveillance that took place that day," and that it would "be able to watch the defendant pick up merchandise from the store and exit the doors without paying for the coats."

¶ 37 We are of course mindful of, and in agreement with, the admonition of the Supreme Court of Illinois in *People v. Wilmington*, 2013 IL 112938, ¶ 35, that the mere fact that a jury sends a note or notes to the trial judge should not, in and of itself, be read to mean "that the jury at any time had reached an impasse or that the jurors themselves

21

considered this a close case."  As the State conceded at oral argument in this case, when viewed within the totality of the circumstances of the entire case, the behavior of the jury is but one factor for us to consider.  Nonetheless, in light of our conclusion that Womick's testimony could certainly be viewed as less than convincing, and that Officer Lomax's testimony did not assist the State in any meaningful way, the events that transpired with regard to the jury and the video disk give us pause, and do not support the State's contention that the evidence in this case was not closely balanced, but was instead "overwhelming."

¶ 38    As explained above, the jury sent the judge a very specific note related to a video disk that had been admitted into evidence by the State.  The note stated: "Can we please see the video?  We feel that it was too far away."  The judge stated that his intention was "to replay the video for the jurors with the screen pulled closer to the jury box."  Neither party objected, and counsel for the defendant noted for the record, "[M]y approximation is the TV is now ten feet closer to the jury," to which the trial judge responded, "Oh, at least."  As the judge prepared to again play the video disk for the jury, juror H. asked if there was "any way you can extend that to the full screen so it is expanded a little more?"  The judge's one-word answer was "nope."  He played the video disk for the jury, and then, without prompting from the jury or from either party, asked, "Is that good or do you want me to play it one more time?"  Juror B. stated the following: "Could you play that one more time?  Could you pause one part particularly?  Freeze frame?"  Juror A. then asked, "Could you freeze it?  Can you freeze it?"  Despite having just asked the jurors, *sua sponte*, if they wished for him to play the video disk one more time, and despite juror

B. asking, *inter alia*, if the judge could play it one more time, the judge's response–apparently to all of the questions just asked of him–was again the single word "nope," to which juror A. responded, "Aw, man."

¶ 39    The jury that returned a verdict finding the defendant guilty of retail theft approximately one hour after beginning deliberations–and after being limited in the manner in which it could view one of the admitted exhibits–was a jury that had not been asked if it accepted that the defendant did not have to present any evidence or testify, and that if the defendant did not testify it could not hold it against him.  And, of course, as explained above, in this case the defendant exercised his right not to introduce any evidence on his own behalf, and, in conjunction with the exercise of that right, stated for the record, outside the presence of the jury, that it was his "desire not to testify."  Given the totality of the circumstances, it would be difficult, at best, to conclude that the trial judge's Rule 431(b) errors did not impact the verdict of the jury.

¶ 40    We add that this is not a case like *People v. Adams*, 2012 IL 111168, ¶ 22, wherein the defendant's theory of the case was so far-fetched that a commonsense analysis of the theory would lead one to conclude it was "highly improbable," albeit "not logically impossible."  To the contrary, the defendant's theory in this case was not far-fetched or illogical at all: it was simply that he was not the person who committed a retail theft at Macy's on the date in question, and that the State had not proven that he was.

¶ 41    In sum, our commonsense, qualitative analysis of the evidence, viewed within the totality of the circumstances present in this case, leads us to conclude that the defendant has met his burden of persuading us that the evidence in this case was so closely balanced

that the trial judge's Rule 431(b) errors alone threatened to tip the scales of justice against the defendant. As the Supreme Court of Illinois observed in *People v. Herron*, 215 Ill. 2d 167, 193 (2005), when a defendant meets "the burden of persuasion and convinces a reviewing court that there was error and that the evidence was closely balanced, the case is not cloaked with a presumption of prejudice," but the error is instead "actually prejudicial" to the defendant. That is because in cases such as this, a reviewing court must "deal with probabilities, not certainties," and "with risks and threats to the defendant's rights." *Id*. "When there is error in a close case, we choose to err on the side of fairness, so as not to convict an innocent person." *Id*. Accordingly, we reverse the defendant's conviction and sentence.

¶ 42 Although we conclude that the evidence in this case was closely balanced, and reversal of the defendant's conviction and sentence is required, we also conclude, after carefully reviewing the record, that the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt. Accordingly, prosecution of the defendant on remand will not violate principles prohibiting double jeopardy (see, *e.g.*, *People v. Naylor*, 229 Ill. 2d 584, 610-11 (2008)). By so finding, "we reach no conclusion as to [the] defendant's guilt that would be binding on retrial." *Id*. at 611.

¶ 43 Because we have determined that the trial judge's Rule 431(b) errors require the reversal of the defendant's conviction and sentence and remand for a new trial, we need not address the second contention raised by the defendant on appeal, as we have no reason to believe the alleged error is likely to recur on remand.

24

¶ 44                                    CONCLUSION

¶ 45    For the foregoing reasons, we reverse the defendant's conviction and sentence and remand for a new trial.


¶ 46    Reversed; cause remanded.

2015 IL App (5th) 130013

NO. 5-13-0013

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 11-CF-636 |
| | ) | |
| JOSHUA MUELLER, | ) | Honorable |
| | ) | William G. Schwartz, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

**Opinion Filed:**          July 17, 2015
_____

**Justices:**          Honorable James R. Moore, J.

Honorable Richard P. Goldenhersh, J., and
Honorable Bruce D. Stewart, J.,
Concur

_____

**Attorneys**          Michael J. Pelletier, State Appellate Defender, Alan D. Goldberg, Deputy
**for**          Defender, Christopher Kopacz, Assistant Appellate Defender, Office of
**Appellant**          the State Appellate Defender, First Judicial District, 203 N. LaSalle, 24th
Floor, Chicago, IL 60601

_____

**Attorneys**          Hon. Michael Carr, State's Attorney, Jackson County Courthouse,
**for**          Murphysboro, IL 62966; Patrick Delfino, Director, Stephen E. Norris,
**Appellee**          Deputy Director, Sharon Shanahan, Staff Attorney, Office of the State's
Attorneys Appellate Prosecutor, Fifth District Office, 730 E. Illinois
Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864

_____