NOTICE
Decision filed 12/03/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 180151-U

NO. 5-18-0151

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Fayette County. |
| | ) | |
| v. | ) | No. 16-CF-105 |
| | ) | |
| CHRISTOPHER SCHOLES, | ) | Honorable |
| | ) | Kevin S. Parker, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Barberis and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for home invasion is upheld under plain error review even though there were violations of the *Zehr* principles where the evidence was not closely balanced.

¶ 2    The State charged defendant, Christopher Scholes, with home invasion (720 ILCS 5/19-6(a)(2) (West 2016)), aggravated battery (*id.* § 12-3.05(a)(1)), criminal trespass to a residence (*id.* § 19-4(a)(2)), and endangering the life or health of a child (*id.* § 12C-5(a)(1)), for events occurring on May 15, 2016. The jury found the defendant guilty of home invasion and criminal trespass to a residence. The court sentenced the defendant to a 12-

1

year term of imprisonment for home invasion. The defendant appeals his conviction and sentence. We affirm.

¶ 3                                        BACKGROUND

¶ 4      On May 15, 2016, Shannon Williams and Bryan Williams were at home with their 16-year-old son. The Williams' cars were parked in the driveway. The front door of their home was open, while the glass storm door was closed. Shannon was in the kitchen making lunch when she heard the front storm door open. Believing her 12-year-old son had returned home, Shannon walked from the kitchen to the foyer, where she was confronted by the defendant standing in her foyer. The defendant was hunched over, swinging his arms, and growling. Shannon screamed at the defendant to "Get out, Get out." When the defendant did not leave, Shannon yelled for Bryan.

¶ 5      When Bryan entered the room, he saw the defendant standing in the foyer. Bryan testified that the defendant was "flexed" and growling. Bryan stepped between Shannon and the defendant, raised his arms, and yelled for the defendant to leave. The defendant, who was speaking "gibberish," appeared to only get more agitated and cursed at Bryan. The defendant lunged at Bryan, punching Bryan once in the eye and twice in the mouth. The second punch knocked Bryan backward and down onto one knee. As the defendant moved further into the house, Bryan grabbed the defendant, pushed him back, and hit him. As the two men continued to wrestle, Bryan fell down the step into the sunken living room, rolling his ankle and jamming his toe. Shannon jumped on the defendant's back and grabbed him in a headlock. Bryan then got up and tackled the defendant, knocking all three of them to the ground. Shannon wrenched herself free and called 9-1-1, while Bryan

2

continued to wrestle with the defendant. The Williamses eventually subdued the defendant, with the help of a neighbor, and tied up the defendant with a belt. During the altercation, Shannon and Bryan each noticed a young girl standing by herself on their front porch.

¶ 6    Shannon and Bryan testified they did not know the defendant and had not given him permission to be in their home. Shannon and Bryan were both trained in cardiopulmonary resuscitation and testified that the defendant did not appear to be in respiratory distress at any time during the encounter. The Williamses both testified that the defendant did not appear to have any difficulty breathing, and that he never made any choking gestures or said he was choking or unable to breathe. Bryan testified that there was a playground and a park near his home, approximately 100 yards and 300 yards away respectively, but that other houses were closer to those amenities than his house.

¶ 7    At trial, Bryan testified that he suffered a black eye and injuries to his lips, ankle, and toe as a result of the tussle with the defendant. A cut to Bryan's upper lip required stitches. Bryan testified that his bottom lip "never completely [went] back to normal," and that he has a scar that runs across his bottom lip and a "bump" inside of his mouth. Bryan testified that his foot still hurts whenever he walks barefoot on hard surfaces.

¶ 8    Greg Kline, a sergeant with the Fayette County Sheriff's Department, responded to the emergency call for assistance. When he arrived, the defendant was lying on the floor, having been subdued by the homeowners and a neighbor. Kline testified that the defendant was conscious and did not appear to have any health issues, other than some abrasions on his face from his altercation with the homeowners. Kline described the defendant as

3

volatile, agitated, and aggressive. Kline testified that the defendant stated he went into the home because he was choking.

¶ 9    Phillip Mater, a paramedic, testified that when he arrived at the scene, the police were already there, and the defendant was on the ground. Mater testified that the defendant claimed that he was choking on a rock. Mater examined the defendant and did not find a rock or any other obstruction in the defendant's airway. Mater testified that he did not see any rocks on the floor of the house and that the defendant did not expel a rock or other obstruction while in the ambulance. Mater testified that the entire time the defendant was under his care, the defendant appeared to be breathing normally.

¶ 10   Dr. Glenn Skow, a physician, examined the defendant when he arrived at the Fayette County Hospital on May 15, 2016. Dr. Skow testified that the defendant indicated that he had rocks in his mouth and chest, and that "they were trying to come out." Dr. Skow testified that the defendant opened his mouth and said "See, look," and "ahhh."

¶ 11   Dr. Skow stated that the defendant's breathing was normal, and he did not have any obstructions in his throat. Dr. Skow testified he ordered CT scans of the defendant's chest and head "because he wasn't acting right." Dr. Skow testified he did not observe any rocks in the defendant's throat or anywhere else in his body. Dr. William Moore, a radiologist, testified he reviewed the CT scans of the defendant's neck and chest, and did not observe any rocks in the defendant's body.

¶ 12   During trial, the defendant raised the defense of necessity to the charges of home invasion and criminal trespass to a residence. In support of his defense, the defendant presented the testimony of Shannon Griffith, an investigator with the Illinois Department

4

of Children and Family Services. Griffith testified that she interviewed C.F., the four-year-old daughter of the defendant's girlfriend, the day after the incident. During the interview, C.F. told Griffith that she and the defendant went to the park that day. As they were walking to the park, the defendant was eating something out of a white plastic cup. At the park, the defendant was "acting silly" and put a rock in his mouth. The defendant then started choking on the rock. C.F. stated they went to a residence where the defendant went inside alone without knocking. C.F. also stated that, while she was waiting outside on the porch, she saw someone pull a gun out at some point during the defendant's altercation with the homeowners.

¶ 13    After the State rested, the defendant filed a motion for directed verdict, which was denied. At that time, the State entered a *nolle prosequi* on the charge of endangering the life or health of a child, and the charge was dismissed.

¶ 14    During deliberations, the jury submitted two questions to the court, requesting "clarification on what constitutes 'great bodily harm,'" and requesting to know "what constitutes battery." After conferring with the parties, the court responded:

> "There is no definition of 'great bodily harm.' The definition of battery is as follows:
> A person commits the offense of battery when he intentionally or knowingly and without legal justification and by any means causes bodily harm to another person.
> The defendant is charged with 'aggravated battery,' not 'battery.' "

¶ 15    The jury convicted the defendant of home invasion and criminal trespass to a residence. The jury acquitted the defendant on the charge of aggravated battery, which

5

required a finding that the defendant caused great bodily harm during the commission of a battery.

¶ 16    On June 9, 2017, the court conducted a sentencing hearing. Shannon and Bryan provided victim impact statements to the court. Bryan testified as to the emotional impact the incident has had on his family, as well as to the lasting physical injuries he sustained. Bryan stated that he had scars on the inside of his mouth and that his "foot is still not right."

¶ 17    The defendant's mother, cousin, and the defendant himself testified on his behalf at the hearing. The defendant presented evidence that he has four children, between ages 7 and 14 years old, and that he and his children love and care for each other. The evidence was that the defendant did not have custody of his children and that he did not financially support the children. The defendant presented evidence that he had been a drug addict for almost 20 years but denied being under the influence on the day of the incident. The defendant maintained that he went to the Williams' home because he was choking and asserted that Bryan attacked him shortly after the defendant entered the home.

¶ 18    At the conclusion of the evidence, the State argued that the defendant's conduct caused serious harm to Bryan and resulted in injuries requiring multiple stitches and which left scars. The State recommended a sentence of 23 years in the Department of Corrections, to be served at 85%, in order to deter others from committing the same crime, and to account for the defendant's significant criminal history, including convictions for battery, aggravated battery, home invasion, criminal trespass to a residence, and resisting a police officer.  The defendant argued the court should not find that Bryan suffered "great bodily harm" because the jury's acquittal of the defendant for aggravated battery indicated that

6

the jury resolved this issue in favor of the defendant. The defendant requested an eight-year sentence because the defendant was a drug addict and the circumstances were unlikely to recur.

¶ 19    After considering the evidence presented at trial and the sentencing hearing, the court sentenced the defendant to 12 years in the Department of Corrections. The court held the defendant had to serve 85% of the sentence, finding that the defendant had caused great bodily harm to Bryan Williams during the commission of the offense of home invasion, despite the jury's acquittal on the aggravated battery charge. The court entered the sentence only on the home invasion conviction, finding the offense of criminal trespass to a residence was a lesser included offense.

¶ 20    On July 7, 2017, the defendant filed a motion to reconsider the sentence. The defendant argued that the trial court erred by failing to consider the factors in mitigation and in finding that the defendant's conduct caused great bodily harm because the State failed to prove that proposition at trial. On March 1, 2018, the trial court entered an order denying the defendant's motion to reconsider. With regard to the court's finding that the defendant's conduct caused great bodily harm, the court found the State's burden of proof at sentencing was lower than that at trial and that the court was not bound by the jury's acquittal of the defendant for the offense of aggravated battery. Specifically, the trial court found the evidence demonstrated that Bryan suffered lasting injuries to his mouth and foot from the defendant's attack. This appeal follows.

¶ 21                                    ANALYSIS

¶ 22                              *Zehr* Admonishments

¶ 23    In his first point, the defendant argues the trial court violated Illinois Supreme Court

Rule 431(b) (eff. July 1, 2012), and because the evidence was closely balanced, this court

should reverse and remand for a new trial. Rule 431(b) requires the trial court to ask all

potential jurors whether they understand and accept four fundamental principles of criminal

law: that the defendant is presumed innocent of the charges against him, that the State must

prove the defendant guilty beyond a reasonable doubt, that the defendant is not required to

offer any evidence on his own behalf, and that the defendant's choice not to testify cannot

be held against him. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). These four principles are

commonly referred to as the *Zehr* principles. See *People v. Zehr*, 103 Ill. 2d 472 (1984);

*People v. Sebby*, 2017 IL 119445, ¶ 6. Rule 431(b) was intended to help ensure a fair and

impartial jury by identifying and disqualifying from service potential jurors who are biased

against these principles. *People v. Thompson*, 238 Ill. 2d 598, 609-10 (2010).

¶ 24    The defendant contends, and the State concedes, the trial court erred in

administering the Rule 431(b) admonishments. The record indicates that while the trial

court advised the potential jurors about the *Zehr* principles, it did not inquire whether the

jurors both understood and accepted each of the principles. The trial court's failure to

inquire whether each of the jurors understood and accepted the four principles constitutes

error. See *People v. Mueller*, 2015 IL App (5th) 130013, ¶ 23.

¶ 25    The defendant failed to preserve this issue for appeal by raising it at trial and in a

posttrial motion. See *Sebby*, 2017 IL 119445, ¶ 48 (to preserve issue for appeal, party must

8

object to the error at trial and raise the error in a posttrial motion). Having forfeited the issue, the defendant requests this court to review his claim for plain error.

¶ 26 The plain error doctrine allows the appellate court to review unpreserved errors when a clear or obvious error occurred, and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Sebby*, 2017 IL 119445, ¶ 48; Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Absent evidence that the violation produced a biased jury, a Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine. *Sebby*, 2017 IL 119445, ¶ 52. The plain error doctrine is a narrow, limited exception to the general rule of procedural default. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The defendant has the burden of persuasion under plain error review. *Id.* Here, the defendant only seeks review under the first prong, asserting the evidence in this case was closely balanced.

¶ 27 The first step under the plain error doctrine is to determine whether a clear and obvious error occurred a trial. *Sebby*, 2017 IL 119445, ¶ 49. As already noted, the trial court violated Rule 431(b) by failing to ask all of the potential jurors whether they understood and accepted each of the *Zehr* principles, a clear error.

¶ 28 Next, when reviewing a claim under the first prong, the court must determine if the evidence was closely balanced by conducting a qualitative analysis of the evidence within the context of the case. *People v. Belknap*, 2014 IL 117094, ¶¶ 50, 53; *Mueller*, 2015 IL App (5th) 130013, ¶ 25. The defendant must demonstrate "that the evidence was so closely

9

balanced the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51. If defendant meets this burden, the error is prejudicial. *Id.*

¶ 29 As already noted, the jury acquitted the defendant on the charge of aggravated battery and convicted the defendant on the charges of home invasion and criminal trespass to a residence. The trial court only entered judgment for home invasion because criminal trespass to a residence is a lesser included offense of home invasion. The defendant, who was not a peace officer acting in the line of duty, was charged with committing home invasion in that he knowingly, and without authority, entered the Williams' dwelling, knowing or having reason to know, that the inhabitants were present, threatened the imminent use of force upon them, and intentionally caused injury to Bryan by striking him with a closed fist. See 720 ILCS 5/19-6(a)(2) (West 2016). At trial, the defendant put forth the affirmative defense of necessity, asserting he was choking on a rock and went inside of the Williams' home for assistance. On appeal, the defendant contends the evidence of his defense was closely balanced because it required the jury to make credibility determinations.

¶ 30 In support of his defense, the defendant presented evidence that, after his arrest, he told Kline, Mater, and Dr. Skow that he was choking on rocks. He also presented the testimony of Griffith, who testified that C.F. told Griffith that the defendant went to the Williams' home because he started choking on a rock while they were at the park. Notably, C.F., who was four years old at the time of the incident, also told Griffith that she saw someone brandish a gun during the altercation at the Williams' home, an observation that was unsupported by any other evidence.

10

¶ 31    The overwhelming weight of the evidence presented at trial, however, supports the jury's rejection of the defendant's necessity defense. Shannon and Bryan testified that the defendant exhibited no respiratory distress before, during, or after the altercation in their home. They testified that the defendant's behavior did not suggest that he was seeking assistance, but instead that the defendant was aggressive and attacked Bryan. Although the defendant told Kline, Mater, and Dr. Skow that he was choking on rocks, all these witnesses testified that they saw no evidence that the defendant was choking or having any difficulty breathing. Specifically, Dr. Skow testified that when the defendant presented in the emergency room, the defendant claimed that he currently had rocks in his mouth and chest, and that "they were trying to come out." Dr. Skow testified the defendant was breathing normally and he did not have any obstructions in his throat, but that Dr. Skow ordered CT scans of the defendant's chest and head "because he wasn't acting right."

¶ 32    We find, when viewed in context, the evidence in this case was not closely balanced. Instead, the evidence adduced at trial of the defendant's guilt was overwhelming and outweighed any evidence suggesting the defendant's innocence. The defendant, therefore, failed to demonstrate that the trial court's error potentially affected the outcome in the case, or that the defendant was prejudiced. The evidence in this case was not closely balanced, and thus, there was no plain error justifying reversal of the defendant's convictions.

¶ 33                                  Truth in Sentencing

¶ 34    " 'Truth in sentencing' is a label applied to a change in the statutory method the Department of Corrections uses to calculate good-conduct credit." *People v. Salley*, 373 Ill. App. 3d 106, 109 (2007). Generally, prisoners are entitled to day-for-day good-conduct

11

credit against the sentences they are serving. 730 ILCS 5/3-6-3(a)(2.1) (West 2016); *People v. Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 11. Section 3-6-3(a)(2)(iii) of the Unified Code of Corrections (730 ILCS 5/3-6-3(a)(2)(iii) (West 2016)), however, provides that a person serving a sentence for home invasion shall receive no more than 4.5 days of sentence credit for each month of his sentence of imprisonment when the court makes a finding that the conduct leading to the conviction resulted in great bodily harm to the victim. Meaning, the defendant is excepted from the normal day-for-day good-conduct credit and must serve at least 85% of his sentence. *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 11.

¶ 35    On appeal, the defendant argues the trial court's finding that the defendant's conduct during the home invasion caused great bodily harm to Bryan was against the manifest weight of the evidence. The defendant contends that the injuries sustained by Bryan amounted to "bodily harm" and not "great bodily harm." The defendant further argues that the trial court "disregard[ed] the jury's verdict" by failing to consider the jury's acquittal of the defendant for aggravated battery and its concomitant finding that Bryan did not suffer great bodily harm.

¶ 36    While the term "great bodily harm" is not susceptible to a precise legal definition, it requires an injury of greater or more serious character than an ordinary battery. *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 11. For the purposes of battery, bodily harm means "some sort of physical pain or damage to the body, like lacerations, bruises, or abrasions, whether temporary or permanent." *People v. Mays*, 91 Ill. 2d  251, 256 (1982). Whether the victim's injuries rise to the level of great bodily harm is a question of fact. *Lopez-*

12

*Bonilla*, 2011 IL App (2d) 100688, ¶ 14. So long as the evidence was sufficient to support the court's finding of great bodily harm, we will affirm the court's determination. *Id.* The State's burden of proof at sentencing is lower than that during the guilt phase of the trial. *Id.*

¶ 37    Contrary to the defendant's assertion, the trial court did consider the jury's acquittal of the defendant for aggravated battery; the court simply concluded that it was not *bound* by the jury's determination due to the State's lower burden of proof at sentencing. The record demonstrates that the trial court considered the evidence presented during the trial, and at the sentencing hearing, in assessing whether Bryan suffered great bodily injury as a result of the defendant's conduct. The evidence was that the defendant struck Bryan three times, inflicting injuries that required stitches and resulted in permanent scarring. While defending himself from the defendant's attack, Bryan fell down the step to his living room, injuring his foot. At trial, almost a year after the attack, Bryan testified that his foot still hurt whenever he walked barefoot on hard surfaces. At the sentencing hearing, several months later, Bryan again testified that his foot was "still not right." In light of the fact that Bryan suffered lasting injuries to his mouth and foot from the defendant's attack, the trial court's finding that the defendant caused great bodily harm to Bryan during the commission of the offense of home invasion is supported by the evidence. The trial court did not err in ordering that the defendant's sentence be served at 85%.

¶ 38                                CONCLUSION

¶ 39    Based on the foregoing, the judgment of the circuit court of Fayette County is affirmed.

13

¶ 40    Affirmed.