2021 IL App (1st) 180114-U
No. 1-18-0114

SECOND DIVISION
March 2, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14CR762 |
| | ) | |
| ANDRE YATES, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | William B. Raines, |
| | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* Defendant's attempt murder and armed robbery convictions affirmed where: the State established his guilt of the offenses beyond a reasonable doubt; the court properly admitted text-message screenshots into evidence; he was not prejudiced by the circuit court's failure to properly admonish jurors of the governing principles of criminal law in accordance with Illinois Supreme Court Rule 431(b); and his constitutional right to due process was not violated. Defendant's 70-year sentence affirmed where his sentence was neither unconstitutional nor excessive.

¶ 2    Following a jury trial, defendant Andre Yates was convicted of attempt murder and armed robbery with a firearm and was sentenced to 70 years' imprisonment. Defendant appeals his convictions and the sentence imposed thereon, arguing: (1) the State failed to prove his guilt of

both offenses beyond a reasonable doubt; (2) the court erred in allowing the State to admit text message screenshots into evidence where the State failed to lay a proper foundation for that evidence; (3) he was denied his right to an impartial jury; (4) he was denied his right to due process; and (5) his 70-year sentence is unconstitutional and excessive. For the reasons explained herein, we affirm the judgment of the circuit court.

¶ 3    I. BACKGROUND

¶ 4    On December 9, 2013, 18-year-old high school student Xavier Smith was shot six times. Although he sustained life-threatening injuries, Smith survived. Defendant, a 23-year-old recent acquaintance of Smith's, was subsequently arrested in connection with the shooting and was charged with a number of offenses, including attempt murder, armed robbery, and aggravated battery.

¶ 5    At his attorney's request, defendant, who had a history of mental illness, was examined by a psychiatrist and was found fit for trial. After the parties stipulated to the psychiatrist's fitness findings, defendant elected to proceed by way of a jury trial.

¶ 6    Trial

¶ 7    At trial, Xavier Smith testified that in December 2013, he was a high school senior enrolled in Epic Academy in Chicago. He also worked part-time at the neighborhood youth center located at 72nd and Ellis. Sometime in late November or early December 2013, Christopher Riviera, a family friend who Smith viewed as an "older brother," offered Smith a ride home from the Youth Center. Smith accepted Riviera's offer and joined four other people in the car. One of the other passengers was defendant. Defendant introduced himself as "Dre" and the two conversed during the 30-minute car ride. During their conversation, Smith recalled telling defendant that he was looking to purchase a car of his own. They also talked about tattoo artistry because both men had

performed work as tattoo artists and defendant indicated that he was looking to purchase a tattoo gun. Riviera dropped off defendant first and Smith and defendant exchanged phone numbers before defendant exited the vehicle. Smith saved defendant's contact information in his cell phone and the two began text messaging each other "on and off." In their messages, defendant and Smith continued discussing cars and tattoo artistry and defendant informed Smith that he wanted to purchase one of Smith's tattoo guns.

¶ 8    On December 8, 2013, and December 9, 2013, Smith and defendant exchanged a series of text messages. Smith explained that defendant indicated that he wanted to purchase Smith's Nick Baxter tattoo gun for $600. Smith, in turn, would use $500 from the sale to put a down payment on a vehicle. They agreed to meet on the evening of December 9, 2013, to effectuate the transaction. At approximately 6:30 p.m., Smith took a bus to 83rd and Coles and then walked to 8424 Burham, the location where defendant instructed Smith to meet him. Because it was a dangerous area, Smith brought his great-grandfather's gun, a .40 caliber Glock, with him. The firearm was in his backpack along with some school books and folders and the tattoo gun that he had agreed to sell to defendant. When he arrived at the agreed upon location, defendant greeted Smith and told him that he did not have the money to buy the tattoo gun on his person and that they needed to walk to his "auntie's house" to get it. Defendant then began walking away and Smith "just followed" him.

¶ 9    When they reached an alley, defendant asked Smith to see the tattoo gun to make sure that it was in good shape and to confirm that he wanted to purchase it. Smith removed his backpack from his shoulders and opened the bag to show defendant the tattoo gun. When he did so, defendant reached into the bag, pulled out Smith's great-grandfather's firearm, and stated: "Oh, snap this is mine now." Defendant then pointed the gun at Smith's chest. Smith was "shocked" and "tried to

reach for the gun" to get it back, but when he did so, defendant began shooting at him. Smith estimated that defendant fired six to seven shots at him. Smith dropped his backpack, ran down the alley, and then hopped a fence to get away from defendant. He then began to feel "woozy." When he reached the street, Smith tried to flag down passing cars, yelling "Help, I got shot." Several cars refused to stop to help him. One car did stop momentarily, and the driver told Smith that the police had been called. Smith's chest began feeling "heavy" and he fell to the ground and thought he was going to die. As Smith was laying in the street, a police SUV and an ambulance arrived on the scene and began to render aid. Smith next recalled waking up in the hospital several days later.

¶ 10    When he woke up in the hospital, Smith learned that he had been shot six times, that both of his lungs had collapsed, and that he was "super fortunate to be alive." Smith remained hospitalized until December 19, 2013, when he was discharged. During his hospitalization, Detective Herhold, who had been assigned to investigate the shooting, showed Smith a photo array. Defendant's photograph was included in the array and Smith identified him as the person who had shot him. On December 20, 2013, Smith again discussed the incident with Detective Herhold. That same day, Smith took screenshots of the text messages that he had exchanged with defendant prior to the shooting. He then emailed those screen shots to Detective Herhold. Smith testified that the screenshots were true and accurate representations of the text messages that he and defendant had sent to each other.

¶ 11    On April 28, 2014, Smith met Detective Herhold at the Evidence and Recovered Property division of the Chicago Police Department to retrieve his school books and school work from the book bag that he had dropped at the scene of the shooting. When he opened his backpack, his

school items were inside; however, the tattoo gun that he had agreed to sell to defendant was missing. His great-grandfather's firearm was also missing.

¶ 12       On cross-examination, Smith admitted that he took his great-grandfather's gun and holster without permission. At the time that he did so, he was not licensed to carry a firearm and had never received any firearm training. Smith denied that he was carrying the firearm directly on his person that night; rather, he testified that it remained in his backpack until defendant removed it. Smith also admitted that he had not told his great-grandfather or any of his friends that he was intending to sell one of his tattoo guns to defendant. Smith did, however, inform his mother of his intent to do so, but she was not aware that he had taken his great-grandfather's handgun with him for protection.

¶ 13       When asked about the tattoo gun, Smith admitted that he never provided detectives with details concerning the make and model of the tattoo gun that he had arranged to sell to defendant. Smith, however, denied that he intended to rob defendant on the night of the shooting and further denied that he used the tattoo gun as "bait" to lure defendant to a specific location in order to rob him. Smith acknowledged that the none of the text message screenshots that he provided to Detective Herhold specifically discuss selling a tattoo gun to defendant for $600; rather, the messages contain discussions of cars and tattoo parties. Smith explained, however, that he and defendant also talked on the phone and they arranged for the sale of the tattoo gun during one of their telephone conversations. Thereafter, defendant sent him text message instructing him to meet him at 8424 Burnham on December 9, 2013. That text message was included in the screenshots that he emailed to Detective Herhold.

¶ 14       Smith admitted that he was unable to recall the specific details that he discussed with Detective Herhold while he was in the hospital because he was "heavily medicated" and "super groggy all

the time." Accordingly, he did not recall telling Detective Herhold that defendant hit him in the head with a rock or that he had stolen his great-grandfather's handgun several days prior to the shooting. He also did not recall being read his *Miranda* rights.

¶ 15    Chicago Police Officer Jeff Ciraulo testified that he and his partner, Officer Matt Ward, were dispatched to the area of 8454 South Muskegon at approximately 6:40 p.m. on December 9, 2013, in response to a 911 call relaying that someone had been shot. When they arrived at that location, they encountered Smith, who was laying on the ground "suffering from what he described as a gunshot wound." Smith was in "distress," but was able to relay that he had been shot by someone who he believed resided at 8424 Burnham. Smith indicated that he knew the shooter; however, he did not provide the name of the shooter at that time. Officer Ciraulo radioed for paramedics who arrived at the scene shortly thereafter. As the paramedics were treating defendant, Officer Ciraulo observed what appeared to be four gunshot entrance wounds on Smith's chest. After receiving some preliminary medical treatment on the scene, Smith was transported to Northwestern Memorial Hospital where he was immediately taken into surgery.

¶ 16    Chicago Police Detective Lawrence Herhold testified that he received an assignment to investigate Smith's shooting at approximately 8 p.m. on December 9, 2013. After receiving his assignment, he relocated to an alley located in the vicinity of 8433 South Muskegon. The alley was located between an abandoned single-family house located at 8437 South Muskegon and an open lot. When he arrived at the alley, the scene was secured with crime scene tape and Officers Mota and Frances were in a beat car guarding the area. As he walked the crime scene, which was covered in snow, Detective Herhold observed two spent shell casings from a "40 S&W caliber" in the alley and a holster with a magazine by the abandoned house. He also observed a backpack on the ground. The backpack contained several high school books and Smith's name was on one of

the books. The backpack did not contain a tattoo gun. Detective Herhold testified that he did not personally collect the evidence; rather evidence technician Yvonne Cary Carter was responsible for the collection of the evidence and he was present as she did so. He acknowledged that the snowy conditions made finding and recovering evidence more difficult than it would otherwise potentially be in better conditions.

¶ 17    After spending time at the crime scene, Detective Herhold relocated to Northwestern Hospital at approximately 10 p.m. He was unable to speak to Smith at that time because he was in "critical condition." The following day, Detective Herhold returned to the crime scene and conducted a canvass of the surrounding area. The purpose of the canvass was to attempt to talk to people who resided in the area to ascertain whether anybody heard or saw anything the night before at the time of the shooting. Ultimately, however, he was unable to find any witness with relevant information pertaining to the shooting. Following his neighborhood canvass, Detective Herhold returned to Northwestern Hospital to check on Smith. At that point, Smith was awake, but was on pain medication. Nonetheless, Smith was able to converse with him. Based on the information that Smith provided him during their conversation, Detective Herhold used the police database to search for black males associated with addresses located between 8400 and 8499 South Burnham. Following his database search, Detective Herhold compiled a photo array containing five males who matched the description provided by Smith. Defendant's picture was included in that array because Detective Herhold's database search revealed he went by the nickname "Dre" and was associated with a residence located at 8413 South Burnham, which was located a block away from the alley in which the shooting occurred.

¶ 18    Detective Herhold returned to Northwestern Hospital on December 11, 2013, to show Smith the photo array that he had compiled. After explaining the procedure and obtaining Smith's

signature on a Lineup/Photo Spread Advisory Form, Smith viewed the array and identified defendant as "the guy that shot [him]." Thereafter, on December 15, 2013, Detective Herhold issued an investigative alert for defendant and on December 19, 2013, he was advised that defendant was in police custody. At the time of his arrest, defendant confirmed that he had been residing at 8413 South Burnham.

¶ 19    On December 20, 2013, following Smith's discharge from the hospital, Smith sent him an email containing 21 screenshots of text message conversations between Smith and "Dre" that occurred between December 7, 2013, and December 9, 2013. Detective Herhold printed out the screenshots and inventoried the evidence in accordance with department protocol. Thereafter, on April 28, 2014, he met Smith at the Chicago Police Department's Evidence and Recovered Property division and allowed Smith to remove school books from his backpack that had been recovered at the crime scene.

¶ 20    On cross-examination, Detective Herhold acknowledged that defendant's home address was not situated directly next to the alley in which the shooting occurred; rather, it was located approximately one block away from that alley. He also acknowledged that no tattoo gun was recovered from the crime scene. When he first interviewed Smith on December 10, 2013, at the hospital, Detective Herhold was aware that he was likely on pain medication; however, Smith did not appear to have difficulty communicating or difficulty distinguishing fact from fiction at that time. Smith also appeared coherent the following day when Detective Herhold returned to the hospital to show him the photo array. Detective Herhold acknowledged that Smith never provided him with his cell phone that contained the text messages that he purportedly exchanged with defendant between December 7, 2013, to December 9, 2013; however, he never asked Smith to do

so. He further admitted that he never examined or inventoried Smith's cell phone; rather, he simply printed out the screenshots of the text messages that Smith emailed to him.

¶ 21    Detective Yvonne Cary Carter testified that she was employed as an evidence technician with the Chicago Police Department on December 9, 2013, and that she was assigned to process and collect evidence at the crime scene. She arrived at the alley at approximately 8:25 p.m. and walked through the scene with Detective Herhold. She then placed evidence markers at the scene, photographed the crime scene, and collected relevant evidence, including a backpack, 2 bullet cartridge casings, and a firearm magazine and holster.

¶ 22    After presenting the aforementioned evidence, the State rested its case-in-chief. The defense subsequently moved for a directed finding, but the motion was denied. Defendant elected not to testify and the defense recalled Detective Herhold to provide additional testimony about his interactions with Smith following the shooting. Detective Herhold testified that when he first spoke to Smith on December 10, 2013, Smith relayed that he had met defendant approximately three to four weeks prior to the shooting, not the week prior to the crime. He also admitted that he had stolen his great-grandfather's gun the weekend before the shooting, not the day of the crime. Following Smith's admission that he stole his great-grandfather's gun, Detective Herhold advised Smith of his *Miranda* rights. No criminal charges were ever filed against Smith as a result of his theft of the gun however, as his great-grandfather did not wish to pursue charges. During his initial interview, Smith also reported that defendant had also struck him in the head with a rock prior to shooting him; however, he later retracted that statement. He also reported that he had been shot with a black semi-automatic .9mm firearm; however, that was "partially untrue." The shell casings that were recovered from the alley were fired from a .40 caliber firearm. Detective Herhold further

testified that a search of defendant's residence was performed on December 19, 2013; however, neither a firearm nor a tattoo gun was found at the scene.

¶ 23     After recalling Detective Herhold, the defense rested. Thereafter, the parties delivered closing arguments and the jury received a series of relevant instructions. Following deliberations, the jury returned with a verdict finding defendant guilty of attempt murder, armed robbery, and aggravated battery. Defendant filed a posttrial motion, which was denied, and the cause proceeded to a sentencing hearing.

¶ 24     Sentencing Hearing

¶ 25     At the sentencing hearing, the court was provided with a Presentence Investigation (PSI) report. The report revealed that defendant had two prior criminal convictions, including aggravated battery of a police officer and armed robbery and that he was on parole at the time of Smith's shooting. Defendant described his childhood as "normal" and reported having close relationships with his parents and siblings. At the time of the sentencing hearing, however, defendant's father was imprisoned for an unspecified felony. Defendant also reported that he attended school until the 10th grade and described himself as an "average" student. He was arrested and incarcerated for the first time when he was a 10th grader and he did not return to school following his incarceration. Instead, he obtained employment as a salesman for ADT Security where he made $52,000 annually. Defendant relayed that he suffered from schizophrenia and bipolar disorder and had been prescribed medications to address those disorders.

¶ 26     After the court was presented with defendant's PSI report, Smith's written victim impact statement was read into the record. In his statement, Smith relayed that he suffered from anxiety, depression, and chest pain as a result of the shooting. In addition, ever since he left the Chicago-area for college, he has avoided returning to the City even though he has family members who

reside there. He estimated that he only returned to the Chicago-area five times during his four years of college.

¶ 27      Defendant elected not to provide a statement in allocution and the parties then presented arguments in aggravation and mitigation. In aggravation, the State emphasized the "callousness" of defendant's actions in shooting Smith six times in the chest and the fact that he robbed a high school student even though he reported being gainfully employed at the time of the crime. Moreover, the State emphasized defendant's prior violent criminal past, which included a prior armed robbery conviction, and the fact that he had reoffended and committed that same offense again shortly after he was released from prison and while he was on parole. The State observed that defendant could receive a life sentence based upon the crimes of which he was convicted. Based on the circumstances of the crime, the State urged the court to impose a significant sentence that was commensurate with the seriousness of the injuries that he inflicted upon Smith.

¶ 28      In mitigation, the defense acknowledged defendant's "extensive" criminal background, but emphasized his difficult upbringing, which included the fact that his biological father was only present in his life "sporadically" because he was in and out of prison. Although defendant described himself as an "average student," defense counsel reported that defendant's mother relayed that he had been enrolled in special education classes because he had "memory problems" and was "tongue tied." His mother also indicated that when her son was first released from prison in 2012, he was not capable of living independently and relied on her and his step-father to "manage his behavior" and "manage his money." They were unable to monitor him at all times, however, and as a result, he fell in with the "wrong crowd." In addition, he did not have funds to obtain mental health counseling after he was first released from prison. Defense counsel indicated that defendant was receiving counseling since his 2013 arrest and that he obtained a job in "food

services" while imprisoned. Defense counsel opined that defendant could be a contributing member of society "[w]ith the proper medication and the proper structure." Acknowledging that defendant's attempt murder and armed robbery convictions were each subject to a sentencing range of 6 to 30 years' imprisonment in addition to a mandatory 25-year firearm enhancement for each offense, defense counsel urged the court to impose the minimum sentence allowed: 62 years' imprisonment.

¶ 29　　After hearing the arguments advanced in aggravation and mitigation, the court observed that the minimum sentence allowed was "lengthy" and was "almost a life sentence." The court found, however, that the minimum sentence was not appropriate given defendant's background and the circumstances of the crime. The court emphasized that defendant "ha[d] a history of violence in the sense that he was on parole for armed robbery when he committed th[e] offense" against Smith. Although the court acknowledged defendant's "intellectual disability" and "mental illness[es]," it found that defendant "knew what he was doing" when he shot Smith. Accordingly, the court sentenced defendant to 35 years' imprisonment for first degree murder and 35 years' imprisonment for armed robbery, the sentences to be served consecutively. Defendant's postsentencing motion was denied and this appeal followed.

¶ 30　　II. ANALYSIS

¶ 31　　A. Sufficiency of the Evidence

¶ 32　　On appeal, defendant first challenges the sufficiency of the evidence. He argues that his attempt murder and armed robbery convictions should be reversed outright because Smith was a "wholly incredible" witness and the State failed to prove beyond a reasonable doubt that he shot Smith and stole his tattoo gun.

¶ 33      The State disputes defendant's characterization of Smith's testimony and argues his unrebutted account of the crime established defendant's guilt of both offenses beyond a reasonable doubt.

¶ 34      Due process requires proof beyond a reasonable doubt to convict a criminal defendant. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). In reviewing a challenge to the sufficiency of the evidence, it is not a reviewing court's role to retry the defendant; rather, the court must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found each of the essential elements of the crime beyond a reasonable doubt. *People v. Ward*, 215 Ill. 2d 317, 322 (2005); *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 58. This standard is applicable to all criminal cases regardless of the nature of the evidence at issue. *People v. Bush*, 214 Ill. 2d 318, 327 (2005). The trier of fact is responsible for evaluating the credibility of the witnesses, drawing reasonable inferences from the evidence, and resolving any inconsistencies in the evidence (*People v. Bannister*, 378 Ill. App. 3d 19, 39 (2007)), and a reviewing court should not substitute its judgment for that of the trier of fact (*People v. Sutherland*, 223 Ill. 2d 187, 242 (2006)). As a general rule, the testimony of a single eyewitness, if positive and credible, is sufficient to support a criminal conviction and a reviewing court will not reverse a criminal conviction simply because the defendant alleges that a witness was incredible. *People v. Harris*, 2018 IL 121932, ¶ 27; *People v. Seguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Indeed, a reviewing court will not reverse a defendant's conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to his guilt. *Harris*, 2018 IL 121932, ¶ 26.

¶ 35      A person commits the offense of attempt when, with specific intent to commit another criminal offense, he performs any act that constitutes a substantial step toward the commission of that offense. 720 ILCS 5/8-4 (West 2012)). A person, in turn, commits the offense of first degree

murder when, without legal justification, he kills another person while intending to kill or inflict great bodily harm on that person, or knowing that his actions will cause the other person's death. 720 ILCS 5/9-1(a)(1) (West 2012). Accordingly, to support a conviction for attempted first degree murder, the State must prove that the defendant had a specific intent to kill and committed an act that constituted a substantial step toward the commission of murder. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 58; *People v. Teague*, 2013 IL App (1st) 110349, ¶ 22. Firing a gun at another person is sufficient evidence that the defendant acted with intent to kill. *People v. Mitchell*, 209 Ill. App. 3d 562, 569 (1991).

¶ 36    A person commits the offense of armed robbery when he commits a robbery by knowingly taking the property of another by use of force or threat of force (720 ILCS 5/18-1(a) (West 2012)) and during the commission of that offense, he discharges a firearm that proximately causes great bodily harm to another person. 720 ILCS 5/18-2(a)(4) (West 2012). To sustain a conviction for armed robbery, it is not essential that the proceeds of the crime are recovered; rather a defendant's guilt may be established through circumstantial evidence as opposed to tangible evidence. *People v. Goodum*, 127 Ill. App. 3d 350, 354 (1984).

¶ 37    Defendant does not appear to dispute that Smith's testimony, if believed, was sufficient to prove his guilt of attempt first degree murder and armed robbery beyond a reasonable doubt. Indeed, Smith testified that defendant, a recent acquaintance, removed his great grandfather's firearm from his backpack and fired at him at point black range, shooting him six times in the chest and inflicting life-threatening injuries. See *Mitchell*, 209 Ill. App. 3d at 569 (the act of firing a firearm at another person is sufficient evidence that a defendant acted with intent to kill and will support a conviction for attempt murder). Smith further testified that defendant's use of force caused him to flee the alley and allowed defendant to steal his tattoo gun that was also in his

backpack. Although the tattoo gun was not recovered during a search of defendant's residence 10 days after the crime occurred, the recovery of robbery proceeds is not necessary to sustain an armed robbery conviction. See, *e.g., People v. Hughes*, 259 Ill. App. 3d 172, 178 (1994) (affirming the defendant's armed robbery conviction even though neither a firearm nor robbery proceeds were found on his person less than 20 minutes after the crime). The fact that Smith testified that defendant was interested in purchasing the tattoo gun and the fact that the gun was missing from his backpack when police arrived at the scene supports a reasonable inference that defendant took Smith's Nick Baxter tattoo gun and did so through use of force. See *Goodum*, 127 Ill. App. 3d at 354 (evidence of a defendant's guilt for armed robbery may be established through circumstantial evidence). Smith's testimony, if believed, thus provided sufficient evidence to support defendant's convictions for attempt first degree murder and armed robbery.

¶ 38    Defendant's challenge to the sufficiency of the evidence, however, is premised on his assertion that Smith was a wholly incredible and unreliable witness and that his account of the crime was inconsistent and improbable. For example, although Smith testified that defendant had agreed to purchase a Nick Baxter tattoo gun from him for $600, the text messages that he purportedly exchanged with defendant did not reference arranging for the sale of a tattoo gun. The text messages discussed tattoo artistry and tattoo parties, but not the sale of a tattoo gun. Although defendant is correct that the text messages do not reference any sale, Smith testified that he and defendant also spoke on the phone in addition to exchanging text messages. Accordingly, the mere fact that the parties did not expressly discuss the sale of a tattoo gun via text message does not contradict or undermine Smith's identification of defendant as the individual who shot him and stole his property. Defendant also notes that Smith provided inconsistent accounts of the crime to Detective Herhold. For example, when he was initially interviewed in the hospital, Smith reported

that defendant had struck him in his head with a rock; however, he retracted that statement several days later. Moreover, he told Detective Herhold that he had stolen his great-grandfather's gun the weekend before the shooting, but testified at trial that he obtained the weapon the day of the shooting because he was apprehensive of meeting defendant in a neighborhood he knew to be dangerous. In addition, he initially reported that the gun with which he was shot was a .9mm weapon instead of a .40 caliber firearm. We acknowledge these inconsistencies, but do not agree that they create reasonable doubt as to defendant's guilt. Witnesses who testify in criminal proceedings, like all human beings, are imperfect and courts have recognized that "minor discrepancies" in an eyewitness's testimony does not destroy the witness's credibility particularly where, as here, the witness's identification of the offender is positive and consistent. See *People v. Reed*, 80 Ill. App. 3d 771, 780 (1980) (recognizing that "minor discrepancies" in an eyewitness's testimony do not destroy his credibility and that "[w]here identification is positive, precise consistency as to purely collateral matters is not required to establish guilt beyond a reasonable doubt").

¶ 39     Defendant, however, also takes issue with Smith's "improbable" behavior before and after the shooting. For example, he argues that the rationale that Smith used to explain why he had brought a firearm to meet defendant lacks credibility. As explained above, Smith testified at trial that he obtained the weapon because he was apprehensive of the neighborhood where he had agreed to meet defendant. Defendant, observes, however, that Smith attended school approximately half a mile away from where the shooting occurred and that he should not have been so afraid of being in that neighborhood that he felt he needed a weapon. Upon review, we do not find Smith's rationale as to why he felt the need for a weapon was wholly incredible because he explained at trial that he was familiar with several incidences of violence that had occurred in defendant's

neighborhood. Although we do not condone the fact that Smith stole his great-grandfather's gun, we cannot agree with defendant that the reason that he did so was illogical or improbable such that it created reasonable doubt as to defendant's guilt.

¶ 40    We further disagree with defendant that Smith's failure to immediately identify him as the offender when Officer Ciraulo first arrived at the scene to render aid was fatal to the State's case. Although it is true that Smith did not provide Officer Ciraulo with defendant's name when he was laying on the ground bleeding after being shot six times, he did indicate that he knew the shooter and believed that he lived at 8424 South Burnham. Several days later, after receiving life-saving emergency medical treatment, Smith provided additional information to Detective Herhold, who used that information to compile a photo array that contained defendant's picture. When shown the array, Smith positively identified defendant, a person that he knew, as the man who shot him. See, *e.g., People v. Barnes*, 364 Ill. App. 3d 888, 895 (2006) (observing that the persuasiveness of identification testimony is strengthened by a witness's prior acquaintance of the accused). Accordingly, we cannot agree that the totality of the circumstances of Smith's identification of defendant as the offender was improbable or unreliable.

¶ 41    We reiterate that it is the province of the trier of fact to assess the credibility of witnesses and to resolve any inconsistencies in witnesses testimony. *Siguenza-Brito*, 235 Ill. 2d at 228; *Bannister*, 378 Ill. App. 3d at 39. Here, the jury was apprised of discrepancies in Smith's testimony and clearly resolved conflicts in the evidence in the State's favor. *Siguenza-Brito*, 235 Ill. 2d at 224-25. We decline to substitute our judgment for that of the trier of fact. Accordingly, we reject defendant's challenge to the sufficiency of the evidence and affirm his convictions for attempt murder and armed robbery.

¶ 42    B. Admission of Evidence

¶ 43    Defendant next argues that the circuit court erred in admitting text messages that he and Smith purportedly exchanged because the State failed to lay a proper foundation for the admission of that evidence.

¶ 44    The State responds that the screen shots of the text messages were "properly authenticated" at trial and that the court did not err in admitting the evidence.

¶ 45    As a threshold matter, defendant acknowledges that he failed to properly preserve this issue for review because counsel failed to include the issue in a posttrial motion.  See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (recognizing that to properly preserve an issue for appeal, a defendant must object to the purported error at trial and specify the error in a posttrial motion and that his failure to satisfy both requirements results in forfeiture of appellate review of his claim).  In an effort to avoid forfeiture, however, defendant invokes the plain error doctrine, which provides a limited exception to the forfeiture rule and allows for review of forfeited issues on appeal if the evidence is closely balanced or the error is of such a serious magnitude that it affected the integrity of the judicial process and deprived the defendant of his right to a fair trial. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *People v. Belknap*, 2014 IL 117094, ¶ 48; *People v. Sargent*, 239 Ill. 2d 166, 189 (2010); *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007).  The first step in any plain error analysis is to determine whether any error actually occurred. *Piatkowski*, 225 Ill. 2d at 565; *People v. Rinehart*, 2012 IL 111719, ¶ 15.  If an error is discovered, defendant then bears the burden of persuasion to show that the error prejudiced him. *Sargent*, 239 Ill. 2d at 189-90.   Keeping this standard in mind, we turn now to evaluate the merit of defendant's claim.

¶ 46    The admissibility of evidence is left to the sound discretion of the circuit court, and accordingly a court's decision whether or not to admit evidence will not be disturbed absent an abuse of that

discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12. An abuse of discretion will only be found where the court's ruling is arbitrary or unreasonable or where no reasonable person would adopt the view taken by the circuit court. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 47    As a general rule, the proper authentication of evidence is a "condition precedent" for the admissibility of a piece of evidence. Ill. R. Evid. 901(a) (eff. Jan. 1, 2011). To authenticate evidence, the party seeking its admission must present "evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.* Text message evidence is subject to the same authentication and foundational requirements as ordinary documentary evidence. *People v. Ziemba*, 2018 IL App (2d) 170048, ¶ 51; *People v. Watkins*, 2015 IL App (3d) 120882, ¶ 36. A proper foundation is laid for the admission of documentary evidence when the document at issue is identified and authenticated. *Watkins*, 2015 Ill. App (3d) 120882, ¶ 36; *People v. Chromik*, 408 Ill. App. 3d 1028, 1046 (2011). Authentication of a document requires the party seeking its admission to present sufficient evidence that the document is what the proponent claims it to be. *Ziemba*, 2018 IL App (2d) 170048, ¶ 51. Authentication may be established through direct or circumstantial evidence. *Ziemba*, 2018 IL App (2d) 170048, ¶ 51; *Watkins*, 2015 IL App (3d) 120882, ¶ 36. Circumstantial evidence of authenticity "includes such factors as appearance, contents, substance, and distinctive characteristics, which are to be considered with the surrounding circumstances." *Ziemba*, 2018 IL App (2d) 170048, ¶ 52. Using either circumstantial or direct evidence, the proponent must simply establish that there is a "rational basis upon which the fact finder can conclude that the document did in fact belong to or was authored by the party alleged." *Id.* ¶ 51. When the proponent of a document provides information to support its authentication, the circuit court serves as a "limited screening function" and must ascertain whether the documentary evidence at issue, when viewed in the light most favorable to the party

seeking its admission, is "sufficient for a reasonable juror to conclude that authentication of the particular item of evidence is more probably true than not." *Watkins*, 2015 IL App (3d) 120882, ¶ 36. A circuit court's finding of authentication does not, however, preclude the party opposing the admission of a piece of documentary evidence from contesting its genuineness; rather, it simply indicates that sufficient evidence of the document's authenticity was introduced to warrant the presentation of the evidence to the trier of fact. *Id.* Moreover, even where a document has been authenticated, the issue of authorship is one that is left to the trier of fact to determine. *People v. Downin*, 357 Ill. App. 3d 193, 203 (2005).

¶ 48        Here, we find that the State presented sufficient evidence that the text message evidence was what the State claimed it to be—*i.e.*, messages exchanged between Smith and defendant. At trial, Smith testified that he was introduced to defendant when they were both passengers in a vehicle driven by a mutual friend. During that car ride, defendant introduced himself as "Dre" and the two discovered that they had a shared interest in tattoo artistry. Before parting ways, he and defendant exchanged phone numbers. Smith input the phone number that defendant provided him into his cell phone under the contact name "Dre." Thereafter, Smith exchanged a number of messages with the number that defendant had provided and the two continued to discuss tattoo artistry. Smith further testified that he used the phone number that defendant provided to talk to defendant and that an agreement was reached during one of these phone calls that Smith would sell defendant his Nick Baxter tattoo gun for $600. Defendant subsequently sent Smith a text message directing him to the address where the sale was to take place, 8424 South Burnham, which was an address close to the alley where the robbery and shooting ultimately took place, and an address close to the residence where defendant actually resided: 8413 South Burnham. Following the shooting and his release from the hospital, Smith testified that he took screenshots of the text

messages that he exchanged with "Dre" and emailed them to Detective Herhold. The detective, in turn, confirmed that he received Smith's email and that he printed out the screenshots and inventoried them as evidence. When shown the screenshots at trial, Smith testified that they accurately depicted the messages he exchanged with defendant. Based on the aforementioned evidence, we find that the State properly authenticated the text message screenshots at issue. See, *e.g.*, *Ziemba*, 2018 IL App (2d) 170048, ¶ 53 (finding that a transcript of text messages was properly authenticated based in part, on the testimony of an individual who personally sent and received the text messages at issue who confirmed that the exhibit was a true and accurate representation of his text message exchanges with the defendant).

¶ 49 Although defendant correctly observes that Smith's cell phone was not personally examined by investigating officers and that there was a delay between the time when the text messages were initially sent and received and when Smith emailed screenshots of the text messages to Detective Herhold, he cites to no authority that the text message evidence in this case could not be authenticated for such reasons. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1., 2017) (requiring an appellant to support each argument with citations to relevant authority to avoid forfeiture of an issue on appeal). Ultimately, based on our review of the record, we conclude that State presented sufficient evidence to authenticate the text message screenshots at issue and the circuit court did not abuse its discretion when it admitted them into evidence.

¶ 50 In so finding, we are unpersuaded by defendant's reliance on the Third District's decision in *Watkins*, 2015 IL App (3d) 120882. In that case, police executed a search warrant on a home in which the defendant and five other people were present and discovered narcotics and several cell phones in an open kitchen drawer. *Id*. ¶¶ 11-12. One of the phones contained drug related text messages that were directed to someone named "Charles," which was the defendant's first name.

*Id.* ¶¶ 16-17. Photographs of the messages on the phone were subsequently introduced in the defendant's trial after a police officer testified that the photographs accurately depicted the messages that were discovered in the cell phone. *Id.* ¶ 21. On review, however, the Third District concluded that the circuit court abused its discretion in admitting the text message evidence. *Id.* ¶ 38. In doing so, the court observed that there was no evidence presented as to the phone number associated with the cell phone and no evidence that the phone, in fact, belonged to defendant and emphasized that the officer who introduced the text message evidence at trial "had no personal knowledge of the text messages and had no idea who was the owner or user of the cell phone." *Id.* ¶ 38.

¶ 51      Here, unlike *Watkins*, the witness who was used to authenticate the text message evidence at issue in this case, Smith, did have firsthand knowledge of the text messages. As explained above, Smith testified that after meeting defendant, he input the phone number defendant gave him into his cell phone under the contact name "Dre." Smith subsequently exchanged a series of messages with that number over the next few days and confirmed that the screenshots that he provided to Detective Herhold accurately depicted the messages that he exchanged with defendant. Accordingly, we conclude that *Watkins* does not compel a different result. Having found no error, there can be no plain error. *People v. Hood*, 2016 IL 118581, ¶ 18. Moreover, having found no error, we necessarily reject defendant's alternative claim that his attorney was ineffective for failing to preserve this issue for review. *People v. Bannister*, 232 Ill. 2d 52, 79 (2008) (citing *People v. Hall*, 194 Ill. 2d 305, 354 (2000), and *People v. Alvine*, 173 Ill. 2d 273, 297 (1996)).

¶ 52      C.  Right to an Impartial Jury

¶ 53      Defendant next argues that the circuit court deprived him of his constitutional right to an impartial jury when it failed to properly admonish prospective jurors in accordance with Illinois

Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. July 1, 2012)) during the jury selection process. He acknowledges that he failed to object to the court's faulty admonishments at trial and failed to include this issue in a posttrial motion and thus failed to properly preserve this claim for review, but again invokes the plain error rule and argues that he was prejudiced by the court's failure to adhere to Rule 431(b)'s admonishment requirements because the evidence against him was closely balanced.

¶ 54    The State acknowledges that the circuit court failed to abide by the admonishment requirements of Rule 431(b), but submits that defendant was not prejudiced by the improper admonishments because the evidence against him was not closely balanced.

¶ 55    The constitutional guarantee of due process affords criminal defendants who exercise their right to be tried by a jury of their peers a fair trial decided by an " 'impartial and indifferent' " jury. *People v. Abram*, 2016 IL App (1st) 132785, ¶ 59 (quoting *Morgan v. Illinois*, 504 U.S. 719, 727 (1992)). The *voir dire* process is the mechanism by which the parties and the court may "ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath." *People v. Cloutire*, 156 Ill. 2d 483, 495 (1993). To assist in this process, Illinois Supreme Court Rule 431(b) requires the circuit court presiding over the *voir dire* process to question potential jurors about their understanding and acceptance of four bedrock principles of law applicable to criminal proceedings. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Specifically, the rule provides as follows:

    "The court *shall* ask each potential juror, individually or in a group, whether that juror understands *and* accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted

the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to the specific questions concerning the principles set out in this section." (Emphasis added.) Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 56 This rule sets forth a "mandatory question and response process" and requires the circuit court to "ask each potential juror whether he or she *understands and accepts* each of the principles in the rule." (Emphasis added.) *People v. Thompson*, 238 Ill. 2d 598, 607 (2010); see also *People v. Othman*, 2019 IL App (1st) 150823, ¶ 60 (explaining that "[i]n criminal trials, Illinois judges are required to ask the venire eight simple questions: (1) defendant is presumed innocent: (a) do you understand that? (b) do you accept it?; (2) defendant is not required to offer any evidence on his own behalf: (a) do you understand that? (b) do you accept it?; (3) defendant must be proved guilty beyond a reasonable doubt: (a) do you understand that? (b) do you accept it?; and (4) the failure of defendant to testify on his own behalf cannot be held against him: (a) do you understand that? (b) do you accept it?"). A circuit court's failure to inquire into a potential juror's acceptance and understanding of all four principles constitutes error. *Thompson,* 238 Ill. 2d at 607. The circuit court's compliance with Rule 431(b) is subject to *de novo* review. *People v. Belknap*, 2014 IL 117094, ¶ 41.

¶ 57 Here, at the beginning of the jury selection process, the court addressed the prospective jurors as follows:

"As this is a criminal case, I want to discuss some principles of law which apply in all criminal cases. ***

The charge against the defendant is contained in what's called the complaint or an indictment or information. This is simply the formal method by which the defendant is brought to trial. It may not be considered as evidence against the defendant, nor are you allowed to draw any inference of guilt from it.

Does everyone understand? Please raise your hand if you don't understand.

Let the record reflect that no one has raised their hands.

Under the law defendant is presumed innocent of the charges against him. The presumption remains with the defendant at every stage of the trial and your deliberations on the verdict. It is not overcome unless and until the jury is convinced beyond a reasonable doubt that the defendant is guilty.

Does anyone disagree with this fundamental principle of law? If you disagree with this fundamental principle of law, please raise your hand.

Let the record reflect that no one has raised their hands.

The State has the burden of proving the defendant guilty beyond a reasonable doubt. The State carries this burden throughout the case.

Does anyone disagree with this fundamental principle of law?

Let the record reflect that no one has raised their hand.

The defendant is not required to prove his innocence. The defendant need not present any evidence at all and rely on the presumption of innocence.

Does anyone disagree with this fundamental principle of law?

Let the record reflect that no one has raised their hand.

The defendant does not have to testify. Would anyone hold the fact that the defendant did not testify against the defendant? Does anyone disagree with that, or agree with it?

Let the record reflect that no one has raised their hand.

As jurors you are the judges of the facts in this case. You alone determine which witnesses to believe and how much weight to give the testimony of each witness. For example, law enforcement officers may testify in this case as witnesses. Their testimony is to be considered by you just like any other witness. You must not give more or less weight to such testimony simply because of the occupation of such witness.

Does anyone disagree with this principle of law? If you do, please raise your hand.

Let the record reflect that no one has raised their hand."

¶ 58    Although it clear from our review of the record that the court discussed each of the four principles of law set forth in Rule 431(b) with the venire, it failed to properly question whether each of the potential jurors understood and accepted each of those principles. Instead, the court only inquired whether the members of the jury pool "disagree[d] with" the principles. Therefore, we agree with the parties that a clear error occurred. See, *e.g., People v. Wilmington*, 2013 IL 112938, ¶ (finding that the circuit court failed to comply with Rule 431(b) where it simply asked the venire members whether they "disagreed with" the four legal principles and failed to inquire whether they understood the principles); *People v. Sebby*, 2017 IL 119445, ¶ 49 (reiterating Rule 431(b) requires the trial court to ask potential jurors whether they understand and accept each of the four legal principles delineated therein and finding "clear error" where the circuit court simply inquired whether the venire members " 'had any problems with' " or " 'believed in' " the four principles).

¶ 59      In light of this finding, we must determine whether the error requires reversal under the first-prong of plain error. To establish first-prong plain error, a defendant must demonstrate that "the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him." *Herron*, 215 Ill. 2d at 187. In evaluating such a claim, "[a] reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. Here, we conclude that defendant cannot satisfy that burden.

¶ 60      We reiterate that Smith's testimony concerning the details of the shooting and robbery were not substantially rebutted at trial. He testified that defendant was a recent acquaintance and that the two exchanged text messages about their shared interest in tattoo artistry. They also conversed over the phone and Smith agreed to sell defendant his Nick Baxter tattoo gun for $600. After receiving a text message from defendant on December 9, 2013, directing him to the area of 8424 Burnham to effectuate the sale, Smith took a bus and arrived at the area around 6 p.m. Defendant then led him into a nearby alley, removed a firearm from Smith's backpack, and shot Smith 6 times. Physical evidence supported Smith's account of the shooting as law enforcement officers responding to the shooting recovered ballistics evidence and Smith's backpack in the alley. When police recovered the evidence from the scene, Smith's Nick Baxter tattoo gun was no longer in his backpack. Based on a qualitative, commonsense assessment of the evidence, we disagree that the evidence is closely balanced. This is not a case where State and defense witnesses offered opposing, but equally credible accounts of the crime at issue. *Cf.*, *Sebby*, 2017 IL 2017 IL 119445, ¶ 62 (finding that the evidence against the defendant was closely balanced where the testimony of the defense witnesses was "no less plausible" than the accounts provided by the State's witnesses and where "neither version [wa]s supported by corroborating evidence"); *People v. Naylor*, 229

Ill. 2d 584, 606-07 (2007) (finding that the evidence against the defense was closely balanced where the evidence was essentially a "contest of credibility" between the prosecution and defense witnesses who provided equally credible accounts of the crime and where "no extrinsic evidence was presented to corroborate or contradict either version" of the events). Moreover, this is not a case where the State's key witness's testimony was wholly contradicted by the physical evidence. *Cf. People v. Mueller*, 2015 IL App (5th) 130013, ¶ 30 (finding that the evidence against the defendant was closely balanced where the State's main witness's testimony was contradicted by surveillance video). Rather, this is a case in which the crime victim, who was also the State's primary witness, offered a credible, plausible account of the crime that was not substantially refuted by other witnesses or the physical evidence. Accordingly, because we find that the evidence against defendant was not closely balanced, we conclude that the trial court's failure to comply with Rule 431(b)'s admonishment requirements did not constitute plain error warranting reversal of the judgment on appeal. Although we find that the court's failure to comply with Rule 431(b)'s admonishment requirements did not amount to plain error in this case, we emphasize the importance of ascertaining jurors' acceptance and understanding of the four bedrock principles of law contained therein. A simple way to ensure that the principles are properly discussed would be for the circuit court to write down eight requisite questions and to read from the list during the *voir dire* process.

¶ 61    D.  Due Process

¶ 62    Defendant next argues that the circuit court denied him his constitutional right to due process when it failed to conduct an independent inquiry to assess his fitness for trial and, instead, relied on the parties' stipulation to a psychological report in which he was found fit to stand trial. Defendant acknowledges that this issue was not properly preserved for review and again invokes

the plain error rule and argues that court's failure to conduct a proper fitness inquiry constituted second-prong plain error.

¶ 63    The State responds that the court was never required to hold a fitness hearing or conduct an independent fitness inquiry because there was no *bona fide* doubt as to defendant's fitness to stand trial. Although defense counsel requested that defendant be examined, counsel did not raise any concerns of his fitness to stand trial and assist in his defense; rather, counsel simply indicated she sought an examination because of his mental health history and diagnosis. Similarly, the circuit court never expressed concerns as to defendant's fitness. Accordingly, because no *bona fide* doubt as to defendant's fitness existed, State argues that the court was not required to conduct a fitness hearing.

¶ 64    The constitutional guarantee of due process bars the prosecution of a criminal defendant who is unfit to stand trial. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2; *People v. Hanson*, 212 Ill. 2d 212, 216 (2004). A criminal defendant is deemed legally unfit "if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2012); see also *People v. Easley*, 192 Ill. 2d 307, 320 (2000) ("Fitness speaks only to a person's ability to function within the context of a trial. It does not refer to sanity or competence in other areas. A defendant can be fit for trial although his or mind may be otherwise unsound"). Every criminal defendant is presumed fit to stand trial, enter a plea, and be subject to sentencing absent the existence of circumstances that create a *bona fide* doubt as to the defendant's fitness. 725 ILCS 5/104-10 (West 2012); *Easley*, 192 Ill.2d at 318; *People v. Sanchez*, 169 Ill. 2d 472 (1996). A *bona fide* doubt has been defined as a "real, substantial and legitimate doubt" and the test is an objective one. *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991). The mere fact that a defendant has a history of mental illness does

not, by itself, create a *bona fide* doubt as to his competency to stand trial. *Hanson*, 212 Ill. 2d at 224-25; *Eddmonds*, 143 Ill. 2d at 519. Similarly, a criminal defendant is not presumed unfit simply because he has been prescribed and ingesting psychotropic medication. 725 ILCS 5/104-21(a) (West 2012). Factors to consider in determining whether a *bona fide* doubt of fitness exists include a defendant's behavior and demeanor, counsel's representations concerning the competence of his or her client, and any prior medical opinion on the defendant's competence to stand trial. *Hanson*, 212 Ill. 2d at 223; *Easley*, 192 Ill. 2d at 319; *Eddmonds*, 143 Ill. 2d at 518. These factors all relate to the "critical determination of whether the defendant can understand the nature and purpose of the criminal proceedings and is able to assist defense counsel." *Hanson*, 212 Ill. 2d at 222. The aforementioned factors, however, are not dispositive as there "[t]here are 'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.' " *Eddmonds*, 143 Ill. 2d at 518 (*quoting Drope v. Missouri*, 420 U.S. 162, 180 (1975)). Ultimately, the question of whether there is a *bona fide* doubt as to a defendant's fitness to stand trial involves a fact-specific inquiry (*People v. Tapscott*, 386 Ill. App. 3d 1064, 1077 (2008)) and the final determination rests within the sound discretion of the circuit court, which is in the best position to observe the defendant and evaluate his conduct (*People v. Simpson*, 204 Ill. 2d 536, 550 (2001); *Tolefree*, 2011 IL App (1st) 100689, ¶ 53). An abuse of discretion will be found only where the court's ruling is arbitrary, fanciful or unreasonable or where no reasonable person would take the view adopted by the circuit court. *Tolefree*, 2011 IL App (1st) 100689, ¶ 53.

¶ 65     Section 104-11 of the Illinois Code of Criminal Procedure of 1963 (Code) sets forth the conditions pursuant to which fitness examinations and fitness determinations are governed. It provides as follows:

"§104-11

    (a) The issue of the defendant's fitness for trial, to plead, or to be sentenced may be raised by the defense, the State or the Court at any appropriate time before a plea is entered or before, during, or after trial. When a bona fide doubt of the defendant's fitness is raised, the court *shall* order a determination of the issue before proceeding further.

    (b) Upon request of the defendant that a qualified expert be appointed to examine him or her to determine prior to trial if a bona fide doubt as to his or her fitness to stand trial may be raised, the court, in its discretion, *may* order an appropriate examination. However, no order entered pursuant to this subsection shall prevent further proceedings in the case." (Emphasis added.) 725 ILCS 5/104-11 (a), (b) (West 2012).

¶ 66    While section (a) "places a mandatory burden on the trial court judge to order a determination of a defendant's fitness when a *bona fide* doubt of that fitness is raised," (*People v. Mitchell*, 189 Ill. 2d 312, 330 (2000)), section (b), in contrast, affords a circuit court that has not been convinced that a *bona fide* doubt of fitness exists, with the discretion to appoint an expert to examine the defendant and help the court determine whether a *bona fide* doubt of fitness exists (*People v. Garcia*, 2012 IL App (1st) 103590, ¶ 124).

¶ 67    Our supreme court has explained the interplay between sections (a) and (b) as follows:

"Sections 104-11(a) and (b) may be applied in tandem or separately, depending on if and when the trial court determines a *bona fide* doubt of fitness is raised. If the trial court is not convinced *bona fide* doubt is raised, it has the discretion under section 104-11(b) to grant the defendant's request for appointment of an expert to aid in that determination. 725 ILCS 5/104-11(b) (West 2000). Even for a motion filed under section 104-11(a), the trial court could specify its need for a fitness examination by an expert to aid in its

determination of whether a *bona fide* doubt is raised without a fitness hearing becoming mandatory. In either instance, after completion of the fitness examination, if the trial court determines there is a *bona fide* doubt, then a fitness hearing would be mandatory under section 104-11(a) (725 ILCS 5/104-11(1) (West 2000)) [Citations.] Conversely, if after the examination the trial court finds no *bona fide* doubt, no further hearings on the issue of fitness would be necessary. Alternately, section 104-11(b) may be bypassed entirely if the trial court has already determined without the aid of a section 104-11(b) examination that there is a *bona fide* doubt of the defendant's fitness. In that instance, the trial court would be obligated under section 104-11(a) to hold a fitness hearing before proceeding further. 725 ILCS 5/104-11(a) (West 2000). In sum, the primary distinction between sections 104-11(a) and 104-11(b) is that section 104-11(a) ensures that a defendant's due process rights are not violated when the trial court has already found *bona fide* doubt to have been raised while section 104-11(b) aids the trial court in deciding whether there is a *bona fide* doubt of fitness." *Hanson*, 212 Ill. 2d at 217-18

¶ 68 The mere fact that a court grants a request for a fitness examination, is not by itself, evidence that the court possessed a *bona fide* doubt as to the defendant's fitness. *Id.* at 222. If, after receiving a report following a fitness examination, the court finds that a *bona fide* doubt as to the defendant's fitness to stand trial exists, the court may not simply rely on stipulations to the contents of the report; rather, a court must exercise its discretion in making a fitness determination at a fitness hearing. *People v. Scott*, 2020 IL App (2d) 180378, ¶ 15; *People v. Cook*, 2014 IL App (2d) 130545, ¶ 13.

¶ 69 In this case, although defendant argues that the court was required to preside over a fitness hearing and conduct an independent inquiry of defendant's fitness, he is unable to show that there

was ever a *bona fide* doubt as to his fitness to stand trial in the first place. The record reveals that prior to trial and prior to a hearing on defendant's pretrial motion to suppress, defendant's attorney requested that defendant undergo a Behavior Clinical Examination (BCX) to ascertain his sanity at the time of the offense, assess his ability to understand his *Miranda* rights, and his fitness to stand trial. In requesting the examination, counsel informed the court she was making the request because defendant "has a history of schizophrenia and certainly takes medication for it." The court granted defense counsel's request and entered an order authorizing the examination. At the time the order was entered, neither defense counsel nor the court ever indicated they possessed a *bona fide* doubt as to defendant's fitness to stand trial. Moreover, the record does not reveal that defendant had ever exhibited any behaviors during any prior appearances before the court that created any concerns as to his fitness.

¶ 70    Following the court's order for a fitness examination, defendant was examined by Dr. Fidel Echevarria, a psychiatrist at Forensic Clinical Services, who authored a report on December 12, 2014, following an examination of defendant. Although Dr. Eschevarria had not received defendant's medication records that he had requested from Cermak Health Services at the time that he authored his report, he opined that defendant was sane at the time of the offense, possessed the ability to understand his *Miranda* rights, and was fit to stand trial. With respect to the issue of defendant's fitness, Dr. Eschevarria found that defendant "verbalized understanding the charges he face[d], the nature and purpose of the proceedings against him, the roles of various courtroom personnel, and, if he chooses should be capable of assisting counsel in his defense." The parties stipulated to Eschevarria's findings on the record at a subsequent court date.

¶ 71    Thereafter, during a routine status hearing prior to trial, defense counsel requested "one more status date before we can get to proceed to trial posture." Counsel explained that she had received

records from Dixon Correctional Center and wanted to "contact forensic clinical service to make sure that they have a chance to see those records." The cause was then continued to allow Dr. Eschevarria to review the records. In making her request, counsel never expressed any concerns about defendant's behavior or fitness for trial. Similarly, in granting defense counsel's request, the court did not express concerns about defendant's competency and fitness for trial.

¶ 72    On March 9, 2016, following his review of the records at issue and after completing a clinical evaluation of defendant, Dr. Eschevarria submitted a second report assessing defendant's fitness. In his second report, Dr. Eschevarria again found that defendant was sane at the time of the offense, was capable of understanding his *Miranda* rights, and was fit to stand trial. Regarding defendant's fitness to stand trial, Dr. Eschevarria again concluded that defendant understood the charges against him, the nature of the legal proceedings that he faced, the roles of various courtroom personnel, and was capable of assisting in his defense if he chose to do so. He further found that the psychotropic medications that defendant was prescribed and was ingesting did "not impair defendant's understanding of fitness-related material or his ability to assist counsel in his defense."

¶ 73    During a routine status hearing, the court acknowledged receiving and reviewing Dr. Eschevarria's second report and noted that the doctor was "standing by his earlier opinion as far as sanity at the time of the offense and ability to understand *Miranda*." The court then inquired whether the parties wanted "any additional reports" or whether they were "prepared to stipulate today to the opinion." Defense counsel and the State both agreed to stipulate to Dr. Eschevarria's opinion. Accordingly, the court stated: "Based on the stipulation that if called to testify Dr. Eschevarria would testify based on the most recent order of March 8th of 2016 he completed a clinical evaluation, reviewed the documented records, he would be of the opinion that within a reasonable degree of medical and psychiatric certainty [defendant] is mentally fit to stand trial. I

will accept that stipulation and at this time I will enter a finding of fitness." The cause proceeded to trial where no issues of concerns of defendant's fitness were discussed.

¶ 74    Based on the record, we find no error. There is nothing in the record that shows that defendant lacked the capacity to understand the proceedings against him or assist in his own defense. The circuit court, who had multiple opportunities to observe defendant never expressed any concerns about defendant's fitness. Moreover, defendant's own attorney never expressed any doubts about his fitness. Although counsel requested that he be evaluated, counsel's request was made simply because she was aware of her client's mental health history, not because of any concerns she personally had about her client's fitness for trial. The mere fact that a fitness evaluation was requested and subsequently ordered is not evidence that a *bona fide* doubt as to defendant's fitness existed. See, *e.g.*, *Hanson*, 212 Ill. 2d at 224 (defendant failed to show that there was a *bona fide* doubt as to his fitness where the circuit court simply granted the defendant's unopposed motion for a psychological examination without comment). Given the lack of evidence that the court, defense counsel, or the State possessed doubts as to defendant's fitness at the time that the court ordered defendant to be evaluated, it is apparent that the court did not order a fitness examination because it entertained a *bona fide* doubt as to defendant's fitness to stand trial; rather, the court ordered the examination to determine whether, in fact, a *bona fide* doubt existed in accordance with section 104-11(b) of the Code. Upon receipt of Dr. Eschevarria's reports, the parties stipulated to his findings during a routine court appearance and the court entered a finding of fitness. Where, as here, "a court orders an evaluation without first deciding that a *bona fide* doubt of fitness has been raised, it is procedurally proper for it to conclude solely from the examination's results that no such doubt exists." *Scott*, 2020 IL App (2d) 180378, ¶ 19 (citing *Hanson*, 212 Ill. 2d at 217)

¶ 75      Although defendant construes the court appearance in which Dr. Eschevarria's second report was discussed as a "fitness hearing," the record does not support his interpretation. The record simply shows that during a routine status hearing, the parties acknowledged receipt of the report and stipulated to Eschevarria's findings. The prospect of a fitness hearing had never been discussed and we are unpersuaded by defendant's argument that a routine status hearing was transformed into a fitness hearing absent any prior request for a hearing and absent any earlier finding that there was ever a *bona fide* doubt of defendant's fitness. See *Scott*, 2020 IL App (2d) 180378, ¶ 20 (rejecting the defendant's efforts to characterize a status hearing where a psychologist's report was discussed as a "fitness hearing" where no such hearing had ever been requested and where there had been no prior findings that a *bona fide* doubt as to the defendant's fitness to stand trial ever existed). Moreover, although the court "enter[ed] a finding of fitness" at that routine hearing, there is no evidence that the court made the finding in response to a prior doubt of defendant's fitness; rather, the court was simply acknowledging Dr. Eschevarria's conclusion and the parties' stipulation thereto on the record. See *Id.* (rejecting the defendant's argument that the court's comments that defendant had been found fit when discussing the psychologist's report could be construed as evidence that the court made "an affirmative finding of fitness as if to satisfy a prior doubt of fitness"). Accordingly, given that no *bona fide* doubt as to defendant's fitness had ever been raised or entertained by the court, the court did not err in failing to hold a fitness hearing and in allowing the parties to stipulate to Dr. Eschevarria's reports on the record. *Hanson*, 212 Ill. 2d at 217; *Scott*, 2020 IL App (2d) 180378, ¶ 21.

¶ 76      In so finding, we are unpersuaded by defendant's reliance on *People v. Cook*, 2014 IL App (2d) 130545 and *People v. Contorno*, 322 Ill. App. 3d 177 (2001). In both cases, the circuit court failed to conduct proper fitness hearings after finding that *bona fide* doubts as to the fitness of both

defendants existed and simply allowed the parties to stipulate to psychological reports. *Cook*, 2014 IL App (2d) 130545, ¶¶ 19-20; *Contorno*, 322 Ill. App. 3d at 180. Here, there was never a *bona fide* doubt as to defendant's fitness. Accordingly, no such hearing was required. The court was not required to make its own independent inquiry into defendant's fitness and the parties' stipulations to Dr. Eschevarria's findings did not constitute error. "Having found no error, there can be no plain error." *Bannister*, 232 Ill. 2d at 79.

¶ 77       E.  Sentence

¶ 78       Finally, defendant challenges his sentence. He argues that the 70-year sentence that the court imposed without considering his age and rehabilitative potential "is both unconstitutional under the proportionate penalties clause of the Illinois constitution, and excessive."

¶ 79       The State responds that the 70-year sentence defendant received as a result of offenses that he "committed when he was a 23-year-old adult was not excessive nor did it violate the proportionate penalties clause of the Illinois constitution."

¶ 80       To withstand constitutional scrutiny, "criminal punishment should be graduated and proportioned both to the offender and the offense." *People v. Buffer*, 2019 IL 122327, ¶ 15. To that end, the proportionate penalties clause in the Illinois State Constitution mandates that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The Illinois proportionate penalties clause is "coextensive" with the federal constitution's eighth amendment prohibition against cruel and unusual punishment (*People v. Patterson*, 2014 IL 115102, ¶ 106; *In re Rodney H.*, 223 Ill. 2d 510, 518 (2006)); however, it goes further than the eighth amendment in offering protection against oppressive penalties (*People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 35). "To succeed on a proportionate penalties claim, a defendant must show either that the penalty

imposed is cruel, degrading, or [that it is] so wholly disproportionate to the offense that it shocks the moral sense of the community ***." *People v. Klepper*, 234 Ill. 2d 337, 348-49 (2009). "[W]hether a punishment shocks the moral sense of the community is based upon an 'evolving standard [] of decency that mark[s] the progress of a maturing society.' " *People v. Miller*, 202 Ill. 2d 328, 338 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

¶ 81     Defendant correctly observes that modern jurisprudence incorporating " 'evolving standards of decency,' " has recognized that juvenile offenders are, and should be, treated categorically different from adult offenders for purposes of sentencing. *Buffer*, 2019 IL 122327, ¶ 15 (quoting *Trop*, 365 U.S. at 101 (1958) (plurality opinion)); see also *People v. Holman*, 2017 IL 120655, ¶ 44 (recognizing that "age is not just chronological but a multifaceted set of attributes that carry constitutional significance" for purpose of sentencing). Courts have explained that the disparity in treatment between adult and juvenile offenders is warranted due to the fact that "juveniles have diminished culpability and greater prospect for reform" than adult offenders and are thus " 'less deserving of the most severe punishments.' " *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (quoting *Graham v. Florida*, 560 U.S. 48, 68 (2010)). Accordingly, given the differences between juvenile and adult offenders, courts have repeatedly held that juvenile offenders are " 'less deserving of the most severe punishments.' " *Id.* at 471 (quoting *Graham*, 560 U.S. at 68). For example, in *Roper v. Simmons*, 543 U.S. 541, 578-79 (2005) the United States Supreme Court held that the eighth amendment's prohibition against cruel and unusual punishment forbids the imposition of the death penalty on offenders who were under 18 years of age when they committed their crimes. *Id.* at 578-79. Thereafter, in *Graham*, 560 U.S. 48, the Court held that the imposition of a life sentence without the possibility of parole on a juvenile offender who does not commit a murder, also violates the tenets of the eighth amendment. *Id.* at 82. Finally, in *Miller*, 567 U.S.

460, the Court concluded that any sentencing scheme calling for the mandatory imposition of a life sentence without the possibility of parole on offenders who were under the age of 18 at the time of their offense also violates the eighth amendment's prohibition against cruel and unusual punishment. *Id*. at 489. In doing so, the Court emphasized the importance of considering the "hallmark" mitigating characteristics of youth when sentencing juvenile offenders, including: the recognized "immaturity, impetuosity" of children and their "failure to appreciate risks and consequences;" the family and home environment of juveniles from which they are usually unable to extricate themselves; the extent of the juvenile offender's "participation in" the criminal conduct at issue and the manner in which "familial and peer pressures may have affected him;" the "inability" of juvenile offenders to meaningfully cooperate and coordinate with police officers and prosecutors and their "incapacity" to assist their attorneys in their own defenses; and juvenile defendants' unique prospects of rehabilitation. *Id*. at 477-78.

¶ 82     The Illinois Supreme Court has expanded upon the *Roper-Graham-Miller* trilogy of cases and has since held that courts must consider youth and its unique attendant characteristics prior to imposing discretionary life sentences (*Holman*, 2017 IL 120655, ¶ 46) or *de facto* life sentences, *i.e.* sentences greater than 40 years' imprisonment (*People v. Reyes*, 2016 IL 119271, ¶ 9; *Buffer*, 2019 IL 122327, ¶ 42) on juvenile offenders. Neither the United States Supreme Court nor the Illinois Supreme Court has expanded the scope of the *Roper-Graham-Miller* decisions to include all young adult offenders who commit offenses when they are over the age of 18. The Illinois Supreme Court however, has issued several recent decisions recognizing that although 18 and 19-year-old offenders are not necessarily entitled to *Miller* sentencing relief, they are not precluded from challenging their sentences on those grounds. See, *e.g., Harris*, 2018 IL 121932, ¶ 48 (finding that the defendant, who was 18-years-old at the time of his offense, was "not necessarily

foreclosed" from raising an as-applied sentencing challenge in a post-conviction proceeding); *People v. Thompson*, 2015 IL 118151, ¶ 44 (affirming the denial of the defendant's 2-1401 petition, but holding that the defendant, who was 19-years-old at the time of the crime was "not necessarily foreclosed from renewing his as-applied [*Miller*] challenge" in a postconviction petition).

¶ 83    Defendant, who was 23 years old when he committed the crimes at issue, relies on the aforementioned precedent and argues that evolving standards of decency justify expansion of that precedent to young adult offenders such as himself. Although recent precedent has recognized the potential to expand *Miller*'s holding to teens who have recently reached the age of majority at the time that they committed their offenses, Illinois courts have rejected claims that an offender who was over 21-years-old at the time of the criminal offense was entitled to have the sentencing court consider his age and treat him differently from other adult offenders when imposing a sentence. See, *e.g.*, *People v. Rivera*, 2020 IL App (1st) 171430, ¶ 24 (affirming the circuit court's order denying the defendant leave to file a successive postconviction petition to seeking sentencing relief pursuant to *Miller* where the defendant was 23-years-old at the time of the offense, reasoning that there was no case law to support the proposition that an offender who committed an offense after reaching the age of 21 was entitled to receive special sentencing consideration and treatment different from other adult offenders for sentencing purposes); *People v. Humphrey*, 2020 IL App (1st) 172837, ¶¶ 33-35 (affirming a circuit court order denying the defendant leave to file a successive postconviction petition, reasoning that his argument that the discretionary life sentence he received for crimes he committed at the age of 21 lacked merit where there was no legal authority to support his claim that a life sentence imposed on someone who was 21-years-old or older was unconstitutional and a violation of the Illinois proportionate penalties clause and where there were no special circumstances present that would justify expanding *Miller*'s holding to him);

but see *People v. Savage*, 2020 IL App (1st) 173135, ¶¶ 70-78  (reversing the circuit court's summary dismissal of the defendant's postconviction petition challenging the 85-year sentence he received for a murder he committed when he was 22 years old where there was evidence that his age in conjunction with his drug use made him the functional equivalent of a younger offender and where the circumstances of the crime suggested that he acted impetuously). In rejecting such claims, courts have observed that legislative enactments have evidenced the Illinois legislature's intent to consider youthful offenders as those *under* 21 years of age.  See*, e.g.,* 730 ILCS 5/3-3-9(a)(1.5) (West 2018) (parole review for under-21-year-old offenders is called "youthful offender parole"); Pub. Act. 100-1182 (eff. June 1, 2019) adding 730 ILCS 5/5-4.5-110; Pub. Act 101-288, § 5 (eff. Jan. 1, 2020) (amending 730 ILCS5/5-4.5-110(b) and renumbering as 730 ILCS 5/5-4.5-115(b)) (amending the law to allow persons convicted of first degree murder from seeking parole after 20 years if the offender was under 21 years old at the time of the crime); 730 ILCS 5/5-4.5-95(b) (West 2018) (limiting class X sentencing to recidivist offenders to those "over the age of 21 years"); 705 ILCS 405/1-3(10), (2) (West 2018) (The Juvenile Court Act of 1987 defines a "minor" as a "person under 21 years" and defines an adult as "a person 21 years of age or older").

¶ 84        Here, based on the current legal landscape and relevant details contained in the record, we are unable to conclude that the 70-year sentence that defendant received for crimes he committed when he was 23-years-old is unconstitutional.  Although it is true that defendant received a *de facto* life sentence, the record reveals that the court was aware of his age and that its sentencing decision was informed by its consideration of defendant's potential for rehabilitation as well as circumstances of the crime.  The court was particularly troubled by the fact that defendant committed the instant offense against Smith while he was on parole for a prior armed robbery conviction.  Although the court acknowledged that defendant had a history of mental illness, it

concluded that the facts of the crime showed that defendant "knew what he was doing" when he lured Smith into an alley, shot him 6 times at point-blank range, and stole Smith's tattoo gun. Indeed, there is no evidence to suggest that defendant's mental illness and intellectual abilities rendered him the functional equivalent of a juvenile offender and the circumstances of the offense do not show that defendant acted impetuously in the manner in which a juvenile offender might act. *Cf. Savage*, 2020 IL App (1st) 173135, ¶¶ 70-78. Accordingly, we are unable to conclude that the 70-year sentence that defendant received for crimes he committed as a 23-year-old adult is "so wholly disproportionate to the offense that it shocks the moral sense of the community" (*Kleppe*r, 234 Ill. 2d at 348-49); rather, we find that the sentence that the circuit court elected to impose after considering applicable aggravating and mitigating factors is commensurate with the circumstances of the crime and appropriate given defendant's criminal propensity. See generally *People v. St. Pierre*, 146 Ill. 2d 494, 513 (1992) (recognizing that a sentence generally does not violate the constitutional requirement of proportionality "if it is commensurate with the seriousness of the crime and gives adequate consideration to the rehabilitative potential of the defendant"). Because we find that defendant's constitutional challenge to his sentence lacks merit, we necessarily reject his claim that his trial attorney was ineffective for failing to object to his sentence on constitutional grounds.

¶ 85       Defendant, nonetheless, argues that he is entitled to a new sentencing hearing because his 70-year sentence is "excessive" as it fails to account for his rehabilitative potential.

¶ 86       It is well established that the sentence that the circuit court elects to impose after considering relevant aggravating and mitigating factors is entitled to great deference and will not be reversed absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000); *People v. Lee*, 379 Ill. App. 3d 533, 539 (2008). When a sentence falls within the statutory guidelines, it is presumed

to be proper and will not be disturbed absent an affirmative showing that the sentence is at variance with the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense. *People v. Snyder*, 2011 IL 111382, ¶ 36; *People v. Gutierrez*, 402 Ill. App. 3d 866, 900 (2010).

¶ 87    Here, defendant was convicted of attempt first degree murder and armed robbery which are both Class X offenses subject to a sentence of 6 to 30 years' imprisonment. 720 ILCS 5/8-4(d) (West 2012); 720 ILCS 5/18-2(b) (West 2012). In addition, because defendant personally discharged a firearm that caused great bodily harm to Smith, each offense carried an additional 25-year to life sentencing enhancement. 720 ILCS 5/8-4(c)(1)(D) (West 2012); 720 ILCS 5/18-2(b) (West 2012). Accordingly, defendant was subject to a sentence range of 62 years to life imprisonment. There is thus no dispute that the 70-year sentence the court elected to impose falls within the applicable sentencing range, and is presumed proper. *Gutierrez*, 402 Ill. App. 3d at 900. Although his sentence is 8 years more than the minimum he could have received, the record reflects that the court carefully considered the circumstances of the crime and applicable aggravating and mitigating factors prior to imposing defendant's sentence. As explained above, the court found that the minimum sentence was not warranted given defendant's criminal history and propensity for violence and the circumstances of the crime. Accordingly, we find that defendant has failed to rebut the presumption of propriety afforded to his sentence and has failed to establish that the circuit court abused its discretion and imposed an excessive sentence. Therefore, we affirm defendant's 70-year sentence.

¶ 88    CONCLUSION

¶ 89    For the aforementioned reasons, we affirm defendant's convictions for attempt murder and armed robbery and affirm his 70-year sentence.

¶ 90    Affirmed.